768 So.2d 116 (2000)
Robert RING
v.
DECOR GRAVURE CORP.
No. 99-1965.
Court of Appeal of Louisiana, Third Circuit.
June 7, 2000.
Writ Denied October 6, 2000.
*117 Joseph Bailey, Provosty, Sadler & Delaunay, Alexandria, Louisiana, Counsel for Plaintiff/Appellee.
James J. Hautot, Judice and Adley, Lafayette, Louisiana, Counsel for Defendant/Appellant, Decor Gravure Corp.
Terry Aubin, Wilbert Saucier, Pineville, Louisiana, Counsel for Defendant/Appellant, Roger Bradford.
(Court composed of Judge JIMMIE C. PETERS, Judge GLENN B. GREMILLION, Judge ELIZABETH A. PICKETT).
GREMILLION, Judge.
The defendant, Decor Gravure, appeals the workers' compensation judge's determination that it was the statutory employer of the plaintiff, Robert Ring, at the time he sustained a work-related injury, and that he is entitled to workers' compensation benefits. For the following reasons, we affirm in part, render in part, and remand for further proceedings.

FACTS
This matter began with the manufacture of defective wall board by Decor. Decor manufactures wall board for use in manufactured housing and recreational vehicles. A particular lot of defective wall board was incorporated into mobile homes manufactured by Skyline Corporation, who in turn sold the homes to dealers, including Castle Mobile Homes. Due to the number of homes containing the defective wall board, Skyline contacted Decor and reported that it would be unable to complete all repairs *118 in a timely manner. As a result, and in an effort to appease a good client, Decor decided to hire outside help to assist Skyline with this task.
Decor obtained the name of Ray Archibald, who, along with Roger Bradford, operated a business known as SWAT.[1] Archibald operated out of Tennessee, while Bradford ran an office in Pineville, Louisiana. Wayne Moore, an officer of Decor, contacted Archibald about the proposed work and an agreement was reached whereby SWAT would send a crew of workers to Wisconsin to assist Skyline with the repairs. It was further agreed that SWAT would receive payment once the repairs were completed and a signed release was obtained from the homeowner. Archibald then contacted Bradford and arranged for Ring to travel to Wisconsin to effect the repairs. While in Wisconsin, Ring alleged that he injured his back moving furniture in the mobile home in which he was working.
Ring initially filed a workers' compensation claim and obtained a default judgment against Bradford d/b/a SWAT (Hometown Roofing). Bradford appealed, but we dismissed his appeal from this matter as being untimely. Ring v. Bradford, 97-1527 (La.App. 3 Cir. 1/15/98); 704 So.2d 989. Thereafter, Ring filed another claim against Bradford, as well as claims naming Decor, Skyline, Castle Homes, and Archibald d/b/a SWAT as additional defendants.[2] Both Castle Homes and Skyline were later dismissed from the suit via motions to dismiss and for summary judgment, respectively. In an amended answer, Decor raised a La.R.S. 23:1208 defense, alleging that Ring forfeited his right to workers' compensation benefits by making false statements. Additionally, Decor filed a cross-claim against Bradford, alleging that, if it was found to be Ring's statutory employer, it was entitled to indemnity from Bradford. The matter proceeded to trial against the remaining defendants, Bradford and Decor. Following a hearing, the workers' compensation judge held that Decor was Ring's employer via the two contract theory and that Ring suffered a work-related injury, thus, entitling him to workers' compensation benefits and medical expenses. The workers' compensation judge denied Ring's request for penalties and attorney's fees and further recognized the prior judgment against Bradford. This appeal by Decor followed.

ISSUES
Decor raises five assignments of error on appeal:
1) The workers' compensation judge erred in finding it Ring's statutory employer.
2) The workers' compensation judge erred in failing to address its La.R.S. 23:1208 defense.
3) The workers' compensation judge erred in finding that Ring carried his burden of proof on the causal connection between his alleged accident and health problems.
4) Alternatively, the workers' compensation judge failed to specify the dates Ring is entitled to temporary total disability benefits and supplemental earnings benefits, and which medical expenses are related to the alleged accident.
5) Alternatively, the workers' compensation judge failed to render judgment on its cross claim against Bradford.

STANDARD OF REVIEW
The standard of review in workers' compensation cases is well settled. A workers' compensation judge's findings of *119 fact are subject to the manifest error clearly wrong standard of review. Rosell v. ESCO, 549 So.2d 840 (La.1989). Accordingly, those findings of fact will not be set aside by a reviewing court unless they are found to be clearly wrong in light of the record reviewed in its entirety. Alexander v. Pellerin Marble & Granite, 93-1698 (La.1/14/94); 630 So.2d 706.

STATUTORY EMPLOYER
In its first assignment of error, Decor argues that the workers' compensation judge erred in finding that it was Ring's statutory employer because it never contracted with Skyline to replace the wall boards in any of the mobile homes containing defective material. We disagree.
The two-contract defense to tort immunity arises from reading La.R.S. 23:1061 in conjunction with La.R.S. 23:1032. Since Section 1061 determines tort immunity, it follows that it also determines who is responsible for the payment of compensation benefits. At the time of Ring's accident, Section 1061(A) (emphasis added) provided, in pertinent part:
When any person, in this Section referred to as the "principal", undertakes to execute any work, which is a part of his trade, business, or occupation or which he had contracted to perform, and contracts with any person, in this Section referred to as the "contractor", for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any employee employed in the execution of the work or to his dependent, any compensation under this Chapter which he would have been liable to pay if the employee had been immediately employed by him....
Section 1032 (emphasis added) further provides, in pertinent part:
A. (1)(a) Except for intentional acts provided for in Subsection B, the rights and remedies herein granted to an employee or his dependent on account of an injury, or compensable sickness or disease for which he is entitled to compensation under this Chapter, shall be exclusive of all other rights, remedies, and claims for damages, including but not limited to punitive or exemplary damages, unless such rights, remedies, and damages are created by a statute, whether now existing or created in the future, expressly establishing same as available to such employee, his personal representatives, dependents, or relations, as against his employer, or any principal or any officer, director, stockholder, partner, or employee of such employer or principal, for said injury, or compensable sickness or disease.
(b) This exclusive remedy is exclusive of all claims, including any claims that might arise against his employer, or any principal or any officer, director, stockholder, partner, or employee of such employer or principal under any dual capacity theory or doctrine.
(2) For purposes of this Section, the word "principal" shall be defined as any person who undertakes to execute any work which is a part of his trade, business, or occupation in which he was engaged at the time of the injury, or which he had contracted to perform and contracts with any person for the execution thereof.
The supreme court described the two-contract situation in a footnote in Berry v. Holston Well Service, Inc., 488 So.2d 934 (La.1986). There the court explained:
In that situation, an owner contracts with a general contractor to do a job. The general contractor in turn contracts with a subcontractor for the "sub" to do the whole or a part of the total job contracted by the "general." Under this contractual relationship, the contract work of the "sub" has been held in decisions of the intermediate courts to be automatically within the trade, business or occupation of the "general."
*120 Id. at 936, n. 3 (citations omitted).
The two-contract situation was further described as when "the alleged principal has `contracted to perform' a specified task and `contracts' with another person to carry it outregardless of whether the contracted task would otherwise have been part of his trade, business or occupation." 14 MALONE & JOHNSON, LOUISIANA CIVIL LAW TREATISE, WORKERS' COMPENSATION LAW AND PRACTICE, § 364, at 189 (1994).
In this instance, the workers' compensation judge held that there were two contracts since Decor contracted with Skyline to replace the defective wall board and then, in turn, contracted with Archibald d/b/a SWAT to actually fulfill that agreement. Since Ring was SWAT's employee, Decor became his statutory employer pursuant to Section 1061(A) and was responsible for paying him workers' compensation benefits.
The basis for finding that an agreement existed between Skyline and Decor starts with the product warranty given by Decor to Skyline. Moore, Decor's president, testified that Decor warrants its products for ninety days from the date of delivery to a dealer. He further stated that Decor's only responsibility under its warranty is for the replacement of defective material; it does not pay damages. However, Moore qualified this statement by admitting that Decor will undertake warranty work beyond the stated ninety days in order to maintain a good relationship with a customer of long standing, as was the case here.
Moore testified that Decor received a report from Skyline with regard to the defective wall board and, that after the gravity of the problem was determined, an agreement was reached whereby Decor would assist Skyline's service department in replacing the defective material. At that point, Moore testified that he spoke with another customer and was given the name of Archibald and SWAT. Moore testified that he contacted Archibald and they reached an agreement as to the work to be done and the rate to be paid for that work.
Considering the foregoing evidence, we cannot say that the workers' compensation judge erred in finding that there were two contracts. A contract is an agreement by two or more parties in which obligations are created, modified, or extinguished. La.Civ.Code art.1906. A contract is formed by the parties' consent, which is established through offer and acceptance and may be made orally or in writing. La.Civ.Code art.1927. In this instance, Moore testified that Decor reached an agreement to assist Skyline in replacing the defective wall board. Thus, a contract was confected between Decor and Skyline concerning the replacement of the defective material, and then between Decor and Archibald concerning the fulfillment of the first contract. Accordingly, we affirm the workers' compensation judge's finding that Decor was Ring's statutory employer and that it was responsible for his worker's compensation benefits. This assignment of error is dismissed as being without merit.

LA.R.S. 23:1208 DEFENSE
In its second assignment of error, Decor argues that the workers' compensation judge erred, as a matter of law, by failing to address its material misrepresentation defense pursuant to La.R.S. 23:1208. In its amended answer, Decor asserted that Ring forfeited his right to receive workers' compensation benefits because he made several false statements for the purpose of receiving benefits.
In Menard v. Mama's Fried Chicken, 97-488, p. 2 (La.App. 3 Cir. 3/6/98); 709 So.2d 303, 304, writ denied, 98-0956 (La.6/5/98); 720 So.2d 681, this court stated:
The requirements for a successful claim under the statute resulting in the absolute bar to compensation benefits are (1) there is a false statement or representation, (2) it is willfully made, *121 and (3) it is made for the purpose of obtaining or defeating any benefit or payment. Resweber v. Haroil Constr. Co., 94-2708 (La.9/5/95), 660 So.2d 7. Benefits are not terminated under the section for false statements that are inadvertent or inconsequential, but only false statement (sic) which are determined by the workers' compensation judge, as authorized by La.R.S. 23:1208 to be willfully made for the purpose of obtaining or defeating benefits. Id.

Decor points out two instances where it alleges Ring willfully made false statements for the purpose of receiving workers' compensation benefits. The first involved Ring's failure to admit he had suffered low back pain prior to the incident at issue. Decor argues that Ring lied three times when he denied any prior history of suffering neck or back problems when questioned on October 21, 1996, by his neurosurgeon, Dr. John Patton; during his February 17, 1988 deposition; and on direct examination at the hearing.
Decor contrasts this testimony with Dr. Nader Antonios' April 24, 1997 medical report, which states, "He has low back pain off and on since the '70's. He attributes this to the fact that he fell off the bull. However, he has not been having problem with his low back for the last two to three years." Decor notes that this history was taken less than one month after Ring confirmed his default judgment against Bradford, on March 27, 1997. Decor points out that Ring, when confronted with this evidence, admitted to having chiropractic adjustments up until the early 1990's. Although Ring testified, "I've had pulled muscles and stuff like that, but nothing that ever required a doctor's treatment," he admitted to undergoing chiropractic adjustments for these problems. Ring testified that he "didn't consider a chiropractor a prior injury." When asked if he had experienced chronic low back pain off and on since the 1970's, Ring replied, "I've had some problems, but it never kept me from working. I've had some chiropractor adjustments, but other than that, nothing that I recall." On further questioning regarding his chiropractor visits, Ring stated, "Well, sure, I had I had something wrong with my back, he made an adjustment and I'd walk out of his office and go back to work."
The second instance of misrepresentation pointed out by Decor concerns Ring's failure to disclose work performed by him subsequent to his April 8, 1997 surgery. During his deposition, Ring testified that he engaged in no further employment after performing remodeling work for Larry Faircloth prior to his surgery. However, at the hearing, Ring stated that he worked as a supervisor for Midsouth Carpentry, who was renovating offices for AFCO. When questioned about the discrepancies between his testimonies, Ring stated that he worked four to five days on the AFCO job around Christmas 1997, and then continued that job subsequent to the deposition. He stated that he remembered doing the work around Christmas, because he needed the Christmas money.
As pointed out by Decor, this court has held that the failure of a workers' compensation judge to rule on this issue was an error of law. O'Conner v. Martco Partnership, 96-260 (La.App. 3 Cir. 1/29/97); 689 So.2d 526. However, after reviewing the workers' compensation judge's written reasons, we find that she obviously took these contradictions into account in reaching her decision. In her written reasons, the workers' compensation judge recognized that Ring suffered previous problems with his back; however, she stated that "those problems did not prevent him or disable him from working." Moreover, the workers' compensation judge awarded Ring supplemental earnings benefits for the periods of time he was employed subsequent to September 1996. The general rule is that when a judgment is silent with respect to any demand at issue in the case under the pleadings, that silence acts as an absolute *122 rejection of that demand. Sun Fin. Co., Inc. v. Jackson, 525 So.2d 532 (La.1988). Thus, we affirm the workers' compensation judge's implied finding that Ring's statements were not willfully made for the purpose of obtaining benefits. This assignment of error is without merit.

CAUSAL CONNECTION
In its third assignment of error, Decor argues that the workers' compensation judge erred in finding that Ring satisfied his burden of proving a causal connection between his alleged accident in Wisconsin and his subsequent health problems. We disagree. The workers' compensation judge was presented with two different views of the evidence. One view revealed that Ring injured his back moving furniture in Wisconsin pursuant to Archibald's contract with Decor. The other view revealed that he might have suffered a previous back injury while working in the oilfield or that he injured his back while moving furniture during a move of his own residence after returning from a job in Mississippi.
Ring twice sought treatment for his pain at the St. Francis Cabrini Emergency Room. On September 1, 1996, he complained of mid and lower back pain, radiating into the right upper chest with some right arm tingling and numbness, and recurrent frontal headaches. On September 25, 1996, he complained of pain in his upper and lower back radiating into his right dorsal hand, right posterior arm, left buttocks, and left upper leg and knee; tingling in his right dorsal hand and fingertip; numbness in his right posterior arm, dorsal right hand and left foot; and moderate right hand weakness. In both instances, Ring related his condition to his work-related accident.
Ring sought treatment from Dr. Patton on October 21, 1996, reporting that he injured himself six to eight weeks earlier while working in Wisconsin. Dr. Patton noted that the furniture Ring was setting up fell apart, causing him to lose his balance and fall. Dr. Patton's report states that Ring did not hit his head when he fell. A January 8, 1997 MRI revealed a bulging disc at C6-7 and a possible herniated nucleus pulposus. A February 11, 1997 cervical myelogram revealed a possible herniated disc at C6-7. On April 8, 1997, Dr. Patton performed a C6-7 anterior cervical discectomy and fusion. Following surgery, Ring continued complaining of headaches. On November 3, 1997, he complained of low back pain to Dr. Patton.
Ring was examined by at least three doctors due to his persistent headaches. On April 24, 1997, he was evaluated by Dr. Nader Antonios, a neurologist. Dr. Antonio's report states that Ring was injured in Wisconsin when the furniture he was moving fell apart, causing him to fall and land on his frontal head region. Ring was seen by Dr. Stephen Katz on June 6, 1997, whose report states that Ring was involved in an accident in August 1996, when he tripped and hit his head while moving furniture in a mobile home. He was also seen by Dr. William Ondo, a Houston neurologist, on September 22, 1997. Dr. Ondo's report stated that Ring suffered from six months of headaches initially occurring three weeks subsequent to being hit in the head with a box.
Ring testified that he injured his back on his seventh day in Wisconsin, when the chest of drawers he and his helper, John Day, were carrying fell apart. He stated that he stumbled and fell into the chest when its back fell out while they were moving it. Ring recounted feeling an immediate burning sensation in his shoulder and lower back and attributed it to pulled muscles. Ring stated that his back became sore and prevented him from working the next day and a half. He stated that he complained about his back to Day and that he told the homeowner, Ms. Miller, as well as Castle Mobile Homes's service manager, about his accident.
Ring testified that SWAT was dismissed from the Wisconsin job a day or so later *123 due to Skyline's and the homeowner's displeasure with his work. During the drive back to Louisiana, Ring described his back as being sore and his neck stiff. Upon their arrival in Pineville, Ring stated that he spoke with Bradford about the job and read a letter written by Ms. Miller. When questioned by Bradford about his injury, Ring replied that he had only pulled a muscle.
At some point during the week to ten-day period after his return from Wisconsin, Ring testified that he moved his residence from a house to an apartment. He stated that he was helped by Day and two other guys, who did all of the heavy moving.
Ring's next job for SWAT was in Mississippi and entailed releveling a mobile home and replacing the floor joists, flooring, and the front door unit. Ring testified that he experienced periodic numbness in his right hand during this job, but was unsure of the cause. Although he still felt that he was suffering from a severe muscle pull or strain, he testified that his back was getting progressively worse. On several occasions, Ring stated that he had asked Day to move heavy items so that he could continue working. He testified that he and Day quit working for SWAT prior to finishing the job because of a possible pay cut. Since they were in Pineville when they learned of this, Ring stated that he and Day drove back to Mississippi, unloaded materials for the job, loaded up their tools, and then quit.
Ring testified that he went to the emergency room four or five days after returning from Mississippi, because he was experiencing a burning sensation and constant numbness in his right arm and severe headaches. He stated that he told the emergency room personnel that he hurt his back moving furniture in Wisconsin. Ring returned to the emergency room at least once more before seeing Dr. Patton in November 1996.
Ring testified that his employment with Faircloth, after his first trip to the emergency room, consisted mostly of supervising the work. After seeking treatment from Dr. Patton, Ring testified that he underwent a C6-7 fusion of his cervical spine, which relieved the burning sensation in his hands, but did not relieve his headaches. Ring testified that he has seen four other doctors for his headaches: Dr. Stephen Katz, Dr. Nadar Antonios, Dr. William Ondo, and Dr. Mike Bozeman.
Following his surgery, Ring testified that he supervised renovation work at AFCO for Midsouth Carpentry. His stated that his only other employment consisted of supervising the building of a barn for Keith Patton and helping Ken Patton put up a sign. Ring testified that he has not worked full-time since his surgery because of back pain and headaches, but that he performed the jobs described because he needed to pay his bills. He stated that he was in severe pain while performing these jobs. Ring testified that he suffered no accidents between the Wisconsin job and his trip to the emergency room on September 18, 1996.
Ring was questioned concerning variances between his testimony during the hearing and statements made during his depositions and notes found in his medical records. When asked whether he hit his head on the chest, Ring testified that he thought he hit his head, although he did not remember suffering a contusion or a knot as a result. The fact that he hit his head was reported in Dr. Ondo's records, as well as that of physical therapist, Kevin Mayo. Conversely, Dr. Patton stated that Ring did not hit his head during the accident. Ring testified, however, that it was possible he told Dr. Patton that he did not recall hitting his head.
Another discrepancy concerned Ring's deposition testimony that he never told Castle Home's service manager that he hurt his back. However, at the hearing, he stated that he may have briefly told the service manager that he missed work because *124 he pulled muscles in his back while working.
When questioned concerning the Mississippi job, Ring could not recall loading the necessary materials onto his truck These materials included boxes of vinyl siding, a roll of linoleum, and sheets of plywood. Ring also could not recall unloading the linoleum in Mississippi by lifting the roll over his head and placing it on the top of his shoulders or moving the stove. Instead, he testified that he thought Day and Mr. Warden, the homeowner, moved it. However, Ring thought it possible that he moved a full-sized sofa. He also remembered lifting an exterior door unit with Day's help. With regard to leveling the mobile home, Ring stated that Day jacked the trailer up while he was in the trailer reading the level.
Concerning his employment after SWAT, Ring stated he only worked for Midsouth Carpentry, Faircloth, and the Pattons. Ring testified that he purchased carpet on the AFCO job prior to Christmas 1997, and up to February 1998, but that he did not lay any carpet in 1998.
John Day verified that Ring missed a day of work in Wisconsin after hurting his back when a chest of drawers they were moving fell apart. He stated that Ring complained periodically that his back was sore and, during their trip back to Louisiana, that his back and neck hurt. Upon their arrival at SWAT's Pineville office, Day testified that Bradford had a letter from the Wisconsin homeowner, which mentioned Ring hurting his back.
Day stated that he and two other guys helped Ring move either the week before the Mississippi job or when they returned to Louisiana during the job. He testified that they did all of the heavy lifting during the move because Ring's back was still sore. At that point, Day testified that Ring still believed that he was suffering from a pulled muscle.
Day testified that he and Ring loaded the materials for the Mississippi job onto Ring's truck. These materials included two to three boxes of vinyl siding, weighing fifty pounds per box, and a roll of linoleum, which was twelve feet by one and one-half feet in diameter. Day testified that they had help loading the siding in Pineville and that Mr. Warden helped them unload it in Mississippi. Day testified that they also brought a work box in which they kept their tool boxes and tools. He stated that this box was four feet long by three feet wide by two and one-half feet deep. Day stated that they unloaded all of their tools out of the box before unloading it from Ring's truck.
Day testified that most of the heavy work on the Mississippi job was done by him because Ring's back still hurt. Although Ring may have crawled under the trailer once or twice, Day stated that he jacked the trailer up using hydraulic jacks, which weighed between twenty to thirty pounds. Although Ring may have carried a jack from the truck, Day testified that he placed them underneath the mobile home. Day further stated he removed the flooring after it was cut by Ring.
Day testified that they worked in Mississippi one week, returning to Louisiana at least once. He stated that they returned to Mississippi to retrieve their tools once they decided to quit working for SWAT.
Concerning other jobs he worked with Ring, Day testified that they started on the Faircloth remodeling job two to three weeks after returning from Mississippi. He stated that Ring mostly supervised the work, although he did do some manual work. Day testified that he worked with Ring on three jobs following his surgery: the AFCO job and the two Patton jobs. On all three jobs, Day testified that Ring supervised the work. Day described Ring as unable to perform the same work or lifting that he could prior to his injury in Wisconsin.
Bradford testified that Ring began the Mississippi job a few days after returning from Wisconsin and that he seemed fine *125 while loading his truck with materials for the job. He stated that the Mississippi homeowner contacted him complaining that Ring was leaving the job to return to Louisiana in order to move. When Bradford went to Ring's apartment, he stated that Ring was lying down and that he complained about hurting his back while moving three sets of bedroom furniture upstairs. He stated that Ring assured him he would be returning to work the next day. He stated that Ring went back to Mississippi the next day, collected his tools, and quit. Bradford's last contact with Ring was after he quit and returned to Louisiana.
Bradford testified that he never discussed Ring's physical condition with him; however, he did recall Ring relating early in his employment that he hurt his back while working in the oilfield and that he had seen a chiropractor. Bradford stated that Ring worked a total of 126½ hours on the Mississippi job. He further stated that Day was lying if he testified that Bradford had a letter from Ms. Miller and that he discussed it with Ring after his return from Wisconsin.
Linda Burley, Bradford's niece, was SWAT's Pineville warehouse manager. She recalled the Mississippi job and the materials Ring took with him to complete the job. These materials included floor decking, vinyl siding, insulation, linoleum, and plywood. Burley testified that Ring appeared fine while the two of them loaded the materials onto his truck She stated that they did not have any other help loading the truck. She estimated that the plywood weighed at least 125 pounds, the box of siding weighed 150-200 pounds, and the linoleum weighed over 125 pounds.
Bradford's wife, Geneva, was the SWAT Pineville office manager. She testified that she may have received a letter from Ms. Miller concerning the work Ring did on her mobile home in Wisconsin.
Larry Landry, a former employee of SWAT, testified that he worked for Hooper's Carpet during January 1998, and that Ring purchased carpet from Hooper's at least five times within a two to three month period in the spring of 1998. However, he was unsure if Ring purchased the carpet for himself or for someone else.
Barbara Kelly, an employee of Decor, testified that she spoke with Ms. Miller several times concerning the repairs performed by Ring on her mobile home. She stated that Ms. Miller told her that the workers failed to show up for work one day and gave the excuse that one of them had hurt himself on the job. She further stated that Ms. Miller found the workers at a bar on another occasion when they failed to show up for work.
Tina Warden, the Mississippi homeowner, testified that Ring worked on her mobile home for two weeks and that he never appeared to be injured during that time. She stated that Ring and his helper unloaded a large tool box, weighing approximately 200-300 pounds, from the back of Ring's truck. They carried in a stone fireplace surround, weighing approximately 100 pounds, replaced the old one, and replaced the front door unit, which weighed approximately 80-100 pounds. She stated that Ring and his helper lifted a roll of linoleum off the top of the truck and placed it on their shoulders while moving it to her back porch. Ms. Warden estimated that the linoleum weighed 400 pounds, since she and her husband were unable to move it during a rainstorm. She stated that Ring used electric saws, drills, hammers, and screwdrivers, and that he was able to climb twelve to fifteen feet up a ladder in order to tape the end caps of the mobile home. She stated that he was able to bend and stand while using drills and saws, crawl underneath the trailer, and jump off the back of his truck.
Ms. Warden testified that she and Ring never discussed his health, nor did she ever hear him complain to his helper that he was hurting. In fact, Ms. Warden testified that Ring was whistling while he *126 worked. She testified that she saw Ring lift a hydraulic jack and that he and his helper dropped bricks off the back of his truck, laying them around the yard in different spots. She stated that they both moved appliances and a couch in order to repair the floor of the mobile home; however, she thought they may have used a dolly.
Ms. Warden testified that Ring left the job on a Thursday in order to move and was to return the next Saturday. However, she stated that he called her on Saturday to report that he would be late returning to the job.
David Warden, Ms. Warden's husband, testified that he was present the entire week Ring and his helper worked on his mobile home. He testified that they releveled the mobile home by using two hydraulic jacks and that both Ring and his helper were under the mobile home four to six hours during the process. Mr. Warden stated that he stayed in the mobile home relaying to them when it was level, and that Ring was in and out making sure the two sections of the mobile home were flush. Mr. Warden estimated that Ring crawled underneath the mobile home six to eight times during this process. He stated that Ring appeared fine and that he never discussed his physical condition with him.
Once the trailer was leveled, Mr. Warden testified that Ring and his helper commenced repairing the inside of the trailer. They replaced four to six pieces of sheet rock in the bedroom and hall and then repaired the floor. This entailed moving appliances out of the kitchen and then removing the bowed floor beams. Mr. Warden testified that the beams were six feet long and two inches wide by six or eight inches deep. He further testified that Ring and his helper picked the linoleum off a rack on the top of Ring's truck and placed it on his deck. He stated that when he asked if he could help, Ring told him that it was not his job. Mr. Warden testified that Ring and his helper removed the fireplace surround, which weighed approximately 200 pounds, and placed it in the back of Ring's truck. He estimated that Ring got in and out of his truck fifteen to twenty times while working and that he appeared fine and never complained. Mr. Warden further testified that Ring and his helper removed and replaced the front door unit from his mobile home. He estimated that the old door unit weighed approximately 150 pounds. Mr. Warden testified that Ring left the job so he could go home to move, but that he intended to return to finish the job. When Ring returned, Mr. Warden testified that he only stayed long enough to load up his tools before leaving.
After reviewing the record, we cannot say that the workers' compensation judge erred in finding that Ring suffered a work-related injury. The workers' compensation judge was presented with two permissible views of the evidence as to the cause of Ring's injury and, since she was in a better position to weigh the credibility of each witness, we cannot say that her finding is unreasonable. Thus, we affirm the workers' compensation judge's finding that Ring was injured as a result of a work-related accident. Decor's assignment of error is dismissed as being without merit.

BENEFITS
In its fourth assignment of error, Decor argues that the workers' compensation judge failed to specify the dates that Ring was entitled to receive temporary total and supplemental earnings benefits, and which medical expenses were related to his work-related accident. We agree with Decor and remand the matter to the Office of Workers' Compensation so that a determination on these issues may be made.

INDEMNITY
In its final assignment of error, Decor argues that the workers' compensation judge erred in failing to award it indemnity from Bradford for compensation *127 benefits it paid to Ring. Decor filed a cross claim against Bradford, alleging that if it was held liable for the payment of compensation benefits to Ring, then it was entitled to indemnity from Bradford, Ring's employer.
We agree with Decor that it was entitled to indemnity from Bradford, pursuant to La.R.S. 23:1061(B). Bradford was in partnership with Archibald, doing business as SWAT. La.R.S. 23:1061(B) provides: "When the principal is liable to pay compensation under this Section, he shall be entitled to indemnity from any person who independently of this Section would have been liable to pay compensation to the employee or his dependent, and shall have a cause of action therefore." The workers' compensation judge did not address the issue of indemnity in her written reasons or judgment; thus, this implies that she denied Decor's claim. However, we find error in this decision since she found that SWAT was Ring's direct employee. Andrews v. Spearsville Timber Co., 343 So.2d 1008 (La.1977); PDT, Inc. v. Bell, 27,930 (La.App. 2 Cir. 1/24/96); 666 So.2d 1282, writ denied, 96-0774 (La.5/3/96); 672 So.2d 688; Legros v. Norcen Exploration, Inc., 583 So.2d 859 (La. App. 1 Cir.), writs denied, 588 So.2d 101 (La.1991). Accordingly, we award Decor indemnity from Bradford.

CONCLUSION
For the foregoing reasons, we render judgment awarding the defendant-appellant, Decor Gravure, indemnity from Bradford d/b/a SWAT. The judgment of the workers' compensation judge is affirmed in all other respects; however, we remand the matter to the Office of Workers' Compensation for the determination of the dates Ring is entitled to workers' compensation benefits and which medical expenses are related to his work-related accident. The costs of this matter are assessed to Decor Gravure.
AFFIRMED IN PART; RENDERED IN PART; AND REMANDED.
NOTES
[1] SWAT stands for Service Warranty Authorized Technican.
[2] The record does not contain the disputed claim for compensation naming Bradford (for the second time), Decor, and Castle Homes as defendants. Archibald never appeared or participated in this matter.