765 So.2d 328 (2000)
Jack M. EDWARDS
v.
SAWYER INDUSTRIAL PLASTICS, INC. et al.
No. 99-C-2676.
Supreme Court of Louisiana.
June 30, 2000.
Opinion Granting Rehearing in Part August 31, 2000.
*329 Mark Terrance Hoychick, Young, Hoychick & Aguillard, Eunice, Counsel for Applicant.
Brian A. Homza, Jody T. Benson, Shreveport, Counsel for Respondent.
LEMMON, Justice.[*]
This is a workers' compensation action in which plaintiff claimed physical disability caused by workplace exposure to toxic chemicals. The issue that prompted this court to grant certiorari is whether the record supports the workers' compensation officer's finding that plaintiff proved by a preponderance of the evidence that (1) he was disabled, totally or partially, and (2) his disabling physical condition was caused by exposure to styrene, a known neurotoxin,[1] while working at defendant's industrial plastics plant.

Facts
Plaintiff began his employment with defendant on March 1, 1990. He worked as a mixer[2] for six months and as a lay-up technician[3] until August 27, 1991, when his employment was terminated for reasons unrelated to employment disability. In both of these jobs, plaintiff handled styrene on a daily basis, without chemical masks or respirator devices.[4]
In September 1992,[5] plaintiff filed this workers' compensation action, alleging disability resulting from his exposure to toxic chemicals during his employment.[6] The workers' compensation officer rendered judgment for plaintiff, concluding that he suffered from an occupational disease and was permanently and totally disabled. The officer also awarded plaintiff $2,000 for defendant's arbitrary failure to pay disability benefits, as well as $20,000 in attorney fees.
The court of appeal reversed in a three-to-two decision, holding that plaintiff failed to meet his burden of establishing that his disabling condition was caused by his exposure to toxic chemicals on the job and that the workers' compensation officer was manifestly erroneous in concluding otherwise. 31,316 (La.App.2d Cir.6/18/99), 739 So.2d 856.
This court granted certiorari to review that reversal. 99-2676 (La.12/17/99), 751 So.2d 866.

Evidence at Trial
Because the court of appeal held that the evidence was insufficient to support the judgment in plaintiff's favor, we proceed with a detailed review of that evidence.

1. Lay Testimony
Plaintiff testified that, while working with the chemicals at defendant's plant, he *330 experienced burning and watery eyes; burning skin upon contact with the chemicals; dizziness; queasiness in the stomach; headaches; choking; and shortness of breath. He eventually developed ringing in the ears and diarrhea with blood in the stool. He often vomited in the mornings, and during his last few days of employment, he experienced nausea, gagging, coughing, an itchy nose, shortness of breath and chest tightness. He staggered from time to time, lost his balance while walking, and described the feeling as that of being "drunk." His symptoms continued even after he left the plant for the day and interfered with his sleep.
Plaintiff further testified that he had no sinus problems, asthma, dizziness, lightheadedness, imbalance, nausea, vomiting, sleeplessness, ringing in the ears, diarrhea, shortness of breath, numbness in the hands and feet, leg cramps, or bone, joint or muscle pain prior to working at defendant's plant.
Several former employees of defendant testified regarding their experiencing physical problems similar to those suffered by plaintiff. Guy Owens, who worked for defendant from 1985 until 1990, testified he experienced headaches, queasiness, nose bleeds and burning skin while working as a mixer and lay-up technician. He stated that the headaches and the sleeping and breathing problems continued beyond his employment with defendant and that he subsequently was diagnosed as having two spots on his lungs. He did not suffer from any of these problems prior to his employment with defendant.
Larry Dunn, who worked for defendant from 1989 until 1993, testified that he experienced blurry vision, headaches, nausea, vomiting and burns upon skin contact while performing lay-ups at the plant, although he had none of these problems prior to that employment. He left his job because the employment conditions were detrimental to his health. At the time of trial in 1997, he was still experiencing headaches and depression, and had been treated by doctors for internal bleeding, breathing difficulty, and sinus problems.
Paul McCarty, who was employed by defendant for approximately one year around 1991, testified that he often became dizzy, nauseated and weak in his stomach because of the chemical fumes during the lay-up procedure. He once saw Bryan Dunn, a co-employee, lying on the floor as a result of being overcome by the fumes. He also saw plaintiff and Dunn vomit on the job, although he did not do so. McCarty stated that he also experienced breathing problems, including shortness of breath, wheezing and waking during the night gasping for air. He was diagnosed as having a lung disease and advised not to perform lay-ups. At the time of trial, McCarty was still suffering from shortness of breath, sleep interruptions, indigestion and bowel problems.
Dunn, who still worked for defendant at the time of trial and testified for the defense, testified that he experienced dizziness, headaches and burning eyes while performing mixing and lay-up operations at the plant.

2. Expert Testimony
The court of appeal reversed the judgment of the trial court on the issue of causation, which is an issue of fact. Cay v. State of La., Dep't of Transp. and Dev., 93-0887 (La.1/14/94), 631 So.2d 393. The workers' compensation officer, in determining that plaintiff's medical problems were caused by exposure to toxic chemicals, relied primarily on the testimony of Dr. Thomas Callender, an expert in internal, occupational, environmental and forensic medicine whose practice in large part involved patients that had been exposed to toxic chemicals. However, the court of appeal concluded that Dr. Callender's testimony was "insufficient to carry Claimant's burden on causation." 31,316 at p. 11, 739 So.2d at 862. We accordingly discuss in detail the testimony of Dr. Callender *331 and the evidence supporting and opposing that testimony.
Dr. Callender, based on examinations in February 1994 and in April 1995 and on treatment on a regular basis since June 1995, diagnosed plaintiff as suffering from toxic encephalopathy, a diffuse dysfunction of the brain secondary to some type of toxic exposure. He further concluded that this condition resulted from plaintiff's exposure to multiple organic solvents while working at defendant's plant.
At the 1997 trial, Dr. Callender testified that the symptoms of toxic encephalopathy include depression, fatigue, anxiety, sleep disturbances, sexual dysfunction, memory loss, changes in personality, irritability, mental confusion and disorientation. According to Dr. Callender, plaintiff's toxic encephalopathy inhibited his physical activities by affecting his memory, judgment and decision-making skills, and by causing depression, anxiety, irritability, loss of social skills and inability to think clearly. His severe fatigue syndrome was secondary to the encephalopathy and made it difficult for him to function. Other diagnoses made by Dr. Callender included peripheral polyneuropathy, chronic nasal sinusitis with headaches secondary to inflammation of the trigeminal nerve, chronic sinobronchial syndrome, mild restrictive lung disease and vestibulopathy.[7]
Dr. Callender, noting that Dr. Maria Palmer had examined plaintiff and found depressed reflexes in all extremities and sensory loss, testified that those findings indicated peripheral polyneuropathy that, along with the history of toxic exposure, would support a diagnosis of toxic encephalopathy.
Contradictory evidence was presented by Dr. Douglas Swift, an expert in occupational medicine. Dr. Swift examined plaintiff in December 1996 and observed swelling in the legs and unsteady heel-to-toe walking, but noted that his lung examination, finger-to-nose pointing, bowel sounds and exercise capacity were normal. Dr. Swift further concluded that plaintiff did not suffer from toxic encephalopathy, noting that such a condition is inconsistent with brain dysfunction only on one side of the brain as exhibited by plaintiff. The doctor explained that toxic exposure causes damage to both sides of the brain because the blood that transports the toxins throughout the body flows equally to both sides of the brain.
Pursuant to a joint agreement between the parties, Ronald Goebel, Ph.D., a clinical neuropsychologist, examined plaintiff in February 1997 and directed further testing in March 1997. Dr. Goebel concluded that plaintiff had organic brain dysfunction in the right cerebral hemisphere, noting that the brain dysfunction interfered with some of plaintiff's sensory and motor functions. However, based on "the literature" and his experience with other patients who suffered brain damage, Dr. Goebel did not attribute the dysfunction to exposure to toxic chemicals. According to Dr. Goebel, when a person suffers brain damage from toxic exposure, the damage is a diffuse generalized condition, rather than the lateralized condition that he noted in plaintiff's case.
Dr. Goebel thus concluded that plaintiff's brain dysfunction was not related to toxic encephalopathy. However, he offered no other explanation for the lateralized brain impairment and stated that plaintiff's history provided no other explanation. In addition, Dr. Goebel admitted that he has only seen approximately twenty to thirty toxic encephalopathy cases and that none of those cases were caused by exposure to styrene.
*332 Nevertheless, Dr. Goebel opined that plaintiff was disabled from working at the time of trial because of psychological impairment. According to Dr. Goebel, plaintiff was credible and his complaints were not fabricated. Therefore, the doctor suggested that plaintiff had psychological problems that probably arose from his belief that he was harmed physically by his exposure to toxic chemicals.
Dr. Callender, disagreeing with Dr. Goebel's conclusions regarding toxic encephalopathy, found evidence throughout plaintiff's nervous system of diffuse brain damage. Dr. Callender further stated that even if the damage, as assessed by Dr. Goebel in 1997, appeared to be limited to the right side, that damage nevertheless could have been caused by exposure to toxic chemicals in 1990 and 1991. Dr. Callender explained that the brain does not respond in a uniform fashion to toxins; some areas of the brain are more affected by toxins, and these areas may not resolve themselves as readily as other areas of the brain. Thus, in examining a patient years after exposure, "you actually may have had fairly symmetrical damage originally but some of the damage resolved and you were left with an asymmetrical result. But the original impact may've been symmetrical."
Dr. Callender further explained that the testing available for plaintiff was limited because of his obesity,[8] and the exact areas of the brain that were damaged could not be ascertained. However, the tests he was able to perform indicated diffuse damage to the peripheral and central nervous systems, which is consistent with toxic encephalopathy.

Causation
Two of the three medical experts who testified on the issue found that plaintiff suffered brain dysfunction.[9] The decisive issue in the court of appeal was whether this dysfunction, more probably than not, was caused by the undisputed and significant exposure to styrene at defendant's plant.[10]
Plaintiff did not suffer from any type of brain impairment, nervous system damage, or psychological defects prior to his beginning employment at defendant's plant. In his work, he was consistently exposed, without any type of protective gear or ventilation, to significant amounts of styrene. Moreover, exposure to styrene is undoubtedly a cause of brain dysfunction, and most of the other medical experts supported Dr. Callender's statement that plaintiff's symptoms were consistent with excessive styrene exposure.
Dr. Callender, plaintiff's treating physician who was experienced in treating patients for chemical exposure, attributed the brain dysfunction to plaintiff's employment conditions. Dr. Goebel did not make this same attribution, principally because plaintiff exhibited dysfunction in 1997 only in the right hemisphere, while exposure to styrene normally would result in diffuse damage to cells throughout the brain. However, Dr. Callender, as well as Dr. T. Rick Irvin, an expert in toxicology, explained that although exposure to styrene generally causes diffuse damage to cells throughout the brain, a person years after the exposure may exhibit only localized impairment because of differing rates of repair in damaged portions of the brain.
The workers' compensation officer's factual findings are subject to the manifest error standard of appellate review. Bruno v. Harbert Int'l, Inc., 593 So.2d 357 (La.1992). In Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973), this court defined that standard in the following manner:

*333 When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.
On this record, although there was substantial evidence on which the trier of fact could have reached a contrary conclusion, we cannot say that there was insufficient support for the conclusion that the trier of fact did reach. We therefore set aside the judgment of the court of appeal and reinstate the decision of the trier of fact as to causation.

Degree of Disability
The workers' compensation officer found that plaintiff was totally and permanently disabled. From our review of the record, we conclude that the evidence did not support that determination.[11]
Dr. Callender administered tests on three separate occasions that indicated plaintiff suffered from organic brain disease. The doctor further stated that plaintiff suffered from interstitial fibrosis, a permanent scarring of the lungs that was first diagnosed by Dr. Elias in July 1995, although the pulmonary function had subsequently returned to normal. In Dr. Callender's opinion, plaintiff's physical condition basically will remain constant, but the effects of the disease such as depression may worsen with time. However, he stated that plaintiff was capable of performing a sedentary job.
Dr. Irvin testified that some brain cells repair styrene damage and recover some lost function, but some do not, and the damage may persist for many years.
Dr. Goebel, while finding brain dysfunction, determined that there was only a "mild degree," describing the dysfunction as "slight at best."
In oral reasons for judgment, the workers' compensation officer pointed to "fatigue, inability to concentrate, pain and major depression" as the basis for plaintiffs total and permanent disability.
Benefits for total and permanent disability may be recovered when the employee cannot engage in any self-employment or occupation for wages, whether or not the same or a similar occupation as that in which the employee was customarily engaged before the occupational injury or disease. La.Rev.Stat. 23:1221(2)(a). In order to recover this level of benefits, the employee must prove by clear and convincing evidence that he or she is physically unable to engage in any employment or self-employment of any nature or character. La.Rev.Stat. 23:1221(2)(c).
On the evidence in this record, the workers' compensation officer was manifestly erroneous in concluding that plaintiff proved, by clear and convincing evidence, that he was totally and permanently disabled under Section 1221(2)(c).[12] The judgment should have awarded supplemental earnings benefits for a period not to exceed 520 weeks under La.Rev.Stat. *334 23:1221(3), subject to any credit against such benefits.[13]

Penalties and Attorney Fees
The employer or its insurer must pay benefits timely, as provided in La.Rev. Stat. 23:1201, and failure to pay benefits timely shall result in the assessment of penalties and attorney fees unless the claim may reasonably be controverted. La.Rev.Stat. 23:1201 F.
In the present case, defendant raised a good faith issue of medical causation, which defendant was entitled to take to trial. Indeed, as noted earlier, defendant presented substantial expert medical evidence on which the trier of fact could have reached a different conclusion on the issue of causation.
We conclude that plaintiff's claim was reasonably controverted by the available evidence, and defendant's requiring trial of the causation issue was not arbitrary. Therefore, plaintiff is not entitled to penalties and attorney fees.

Decree
For these reasons, the judgment of the court of appeal is reversed, and the judgment of the workers' compensation officer is reinstated and recast to award plaintiff supplemental earnings benefits for a period not to exceed 520 weeks, subject to a credit for unemployment compensation benefits received by plaintiff, and to deny penalties and attorney fees. The case is remanded to the trial court to fix the amount of supplemental earnings benefits and the amount of the credit for unemployment compensation benefits.
PER CURIAM.
The application for rehearing filed by defendant is granted in part.
The only issue defendant raised is the propriety and amount of the judgment awarding expert witness fees. Because the court of appeal ruled in defendant's favor, that court did not reach this issue, and we did not grant certiorari to discuss that issue. Thus, it is appropriate for the court of appeal to consider defendant'a arguments regarding expert witness fees on remand.
Accordingly, the application for rehearing is granted in part, and the case is remanded to the court of appeal to consider and rule on the expert witness fees issues raised by defendant. Otherwise, denied.
NOTES
[*] Traylor, J., not on panel. Rule IV, Part 2, § 3.
[1] A neurotoxin is a substance that has a direct toxicity on the nervous system, the brain and the peripheral nervous system.
[2] The mixer combined styrene, contained in a fifty-five-gallon drum, with other substances in a windowless room with no ventilation fans. This mixture was then poured into molds by the lay-up technician. The process required the mixer to remove much of the styrene from the drum by using a gallon jug. While doing so, the mixer's face was directly over the open drum, and as the drum was emptied, the mixer had to reach down into the drum to remove the styrene.
[3] The lay-up technician poured the mixture into the molds, spread it with six-inch rollers, covered the mixture with a strip of cloth, and poured additional mixture on top. This process was repeated until the board was created in the desired size.
[4] Defendant's executive officer admitted the employees had no protection from the styrene fumes during the time of plaintiff's employment.
[5] Plaintiff had notified defendant in March 1992 that he was totally disabled from toxic chemicals and requested compensation benefits. See Edwards v. Sawyer Indus. Plastics, Inc., 26,320 (La.App.2d Cir.12/7/94), 647 So.2d 449.
[6] An expert environmental toxicologist testified that the neurotoxic effect of styrene can result from inhalation or from contact by splashing.
[7] Vestibulopathy is a condition that produces imbalance and dizziness, and causes difficulties with a job that requires good balance or agility to ensure safety. Vestibular disease is very typical of exposure to organic solvents. If detected early enough, the condition can be treated with medication and vestibular rehabilitation. According to Dr. Callender, since plaintiff has been without rehabilitation for a length of time, he is not likely to recover.
[8] Plaintiff was six feet, three inches tall and weighed over 350 pounds.
[9] The other medical evidence did not bear significantly on the issue of brain dysfunction.
[10] Dr. Bryan Roberts, a toxicologist who tested the emissions levels of chemicals at defendant's plant, reported relatively high levels of styrene vapors during the lay-up operations.
[11] Because the court of appeal decided in favor of defendant on the issue of causation, that court did not reach the issue of the degree of plaintiff's disability.
[12] Although not totally clear, the workers' compensation officer appears to have applied the preponderance of the evidence standard in determining total and permanent disability.
[13] The parties stipulated in the court of appeal that defendant is entitled to credit for the unemployment compensation benefits received by plaintiff.