1PETERS, Judge.
In this workers’ compensation case, the claimant, Leo Langley, Jr., appeals a judg *1099 ment in favor of his employer, Larco Environmental Services, Inc., on the issue of whether his continuing complaints almost three years after a work-related chemical exposure were causally related to the work accident. For the reasons that follow, we reverse in part and affirm in part.
DISCUSSION OF THE RECORD
Leo Langley, Jr., was employed by Lar-co Environmental Services, Inc. (Larco), beginning in August of 1996. Larco is a hazardous waste disposal service company. At times during the course of his employment with Larco, Langley was engaged in cleanup operations that involved the chemical ethylene dichloride (EDC). On October 6, 1996, he vacuumed out liquid EDC from a tank which contained about “a foot or so” of the liquid. After dressing in a tyvek suit and a full-face respirator, Langley entered the tank containing the liquid EDC and initially remained in the tank only ten minutes because he “started burning from [his] feet.” After changing his suit, he again entered the tank and remained there for approximately thirty minutes before experiencing a burning sensation up to his stomach. He again exited the tank, but, after reentering it for the third time, he remained for about an hour, following which he experienced numbness in his legs and burning. After exiting the tank and removing his respirator and tyvek suit, the fumes from the EDC “hit” him. At that time, Langley experienced nose bleeds, headache, nausea, and burning. He remained out of the tank for about thirty minutes and then returned and finished the job. By that time, he felt the burning sensation all the way up to his neck.
On the day after the incident, Langley saw Dr. B.R. Drumwright, apparently a Sulphur, Louisiana occupational medicine physician. Dr. Drumwright noted 1 ^redness on Langley’s waist, buttocks, and legs and diagnosed him as having skin irritation. Langley returned to work, with Dr. Drumwright placing him on light duty for the week following the incident.
Langley continued to treat with Dr. Drumwright through December 11, 1996. On that date, Dr. Drumwright noted Langley’s complaints of constant nausea, occasional blood in his stool, and dizziness. The doctor also noted on exam that Langley had a slightly red splotchy appearance on his thighs, several white spots on his legs, several circumscribed lesions (two of which the doctor thought had a fungal appearance), and one small, boil-like lesion on his hip. Dr. Drumwright stated: “Review of literature fails to reveal evidence for connecting all of these symptoms with E.D.C.”
On January 6, 1997, Langley began treating with Dr. Thomas J. Callender, a Lafayette, Louisiana physician board certified in internal medicine, occupational medicine, and toxicology. At that time, Langley complained of nausea, headaches, and severe sexual dysfunction. On exam, Dr. Callender reported inflammation of the eardrums, eyes, and lining of the nasal passages; skin lesions on the back; areas of hyperpigmentation; large patches of cracked skin on the feet; acne-type rashes; significant imbalance; and decreased sensation to pinprick and light touch.
Dr. Callender recommended that Langley not return to work. Thereafter, Lar-co’s compensation carrier, Louisiana Workers’ Compensation Corporation (LWCC), began paying temporary total disability benefits.
Langley continued to treat with Dr. Cal-lender. Following a battery of tests, Dr. Callender diagnosed Langley as having peripheral polyneuropathy, dysfunction of the central nervous system probably due to some degree of toxic encephalopathy, *1100 chronic | anasosinusitis with obstructive sleep apnea, chronic dermatitis, and cracked skin. The doctor was of the opinion that all of these conditions were either caused by or significantly contributed to by EDC.
Dr. Callender referred Langley to Dr. Lynn W. Aurich, a clinical neuropsychologist, for a neuropsychological evaluation. Dr. Aurich administered a battery of tests and concluded: “Although there is a causal association (temporal relationship between exposure and reported symptoms) and the fact that EDC is known to be a neurotoxin, the present test results are inconclusive regarding neuropsychological impairment.” Additionally, Dr. Aurich reported that .the test results on malingering measures “call[ed] into question the patient’s motivation during testing.”
At the request of LWCC, on May 30, 1997, Langley saw Dr. Douglas Austin Swift, a Jefferson, Louisiana physician and an expert in occupational health and medicine and toxicology. At that time, Langley’s complaints included headaches; sexual impotence; constant nausea; fecal incontinence and diarrhea seven to nine times a day; insomnia; numbness on the left side of his body, upper and lower extremities, and lips; swelling of the feet in the morning; and decreased energy. Dr. Swift reported essentially normal physical findings on exam and an essentially normal urinalysis and blood count except for elevated cholesterol and a slight elevation of creatinine kinase, a muscle enzyme, which' the doctor found not to be of any concern. Dr. Swift also reviewed outside medical records sent in after the exam. While Dr. Swift found that Langley appeared to have had some type of dermatitis immediately following the EDC exposure, he found that Langley’s escalating symptoms, both in their severity and quantity, were inconsistent with ongoing EDC toxicity. The doctor Lconcluded that, at the time of his exam, there was no evidence of active toxicity from EDC.
Apparently at the request of LWCC, pursuant to La.R.S. 23:1123,[1] the Office of Workers’ Compensation scheduled an independent medical examination for Langley with Dr. Rashid Joseph Tamimie, a Me-tairie, Louisiana physician and an expert in toxicology and occupational medicine. Langley saw Dr. Tamimie on August 26, 1997. He reported numerous symptoms to Dr. Tamimie, including recurrent skin rash; loss of peripheral vision; hearing loss with ringing and buzzing in both ears; discharge from both ears; persistent nasal stuffiness with recurrent nasal ulcers and nose bleeds; pressure about his chest with an inability to walk or exert himself without shortness of breath; persistent cough with upper respiratory infections and phlegm production; colic-like abdominal pain with “freak diarrhea” up to five times a day; blood in his stool; headaches; blurred vision; dizziness on a daily basis; numbness and tingling in his hands, arms, feet, and face; decreased ability to smell; weakness in grip strength; difficulty concentrating; memory loss; sleep difficulty; and stiffness in his joints. Upon physically examining Langley, Dr. Tamimie found no abnormalities except for a rash, which he found to be consistent with a fungal infection not related to EDC. Dr. Tamimie *1101 also reported that the neurological exam was perfectly normal, with somewhat exaggerated responses. The | Bdoctor found no objective abnormalities to substantiate that Langley continued to suffer from any type of exposure to EDC.
On September 9, 1997, LWCC discontinued Langley’s indemnity benefits. The case went to trial on September 16, 1999, on the issues of entitlement to additional indemnity benefits, authorization of additional procedures recommended by Dr. Callender, and penalties and attorney fees. Following the trial, the workers’ compensation judge appointed Dr. Craig A. Vitra-no, a Baton Rouge, Louisiana physician, to conduct an independent medical examination pursuant to La.R.S. 23:1124.1.[2] Dr. Vitrano concluded:
In summary, it is my opinion that (although the mechanism for the dermal exposure is unclear) the available information does seem to support that Mr. Langley did sustain mild acute problems from an exposure to EDC (defatting dermatitis and nausea) but the available information does not seem to support the contention that Mr. Langley suffers from any chronic residual physical impairments as a direct result of the EDC exposure of October 6,1996.
Relying on Dr. Vitrano’s opinion, the workers’ compensation judge held in favor of Larco and LWCC, implicitly rejecting all claims for further indemnity and medical benefits as well as penalties and attorney fees. Langley has appealed.
OPINION
Langley contends that the workers’ compensation judge applied the wrong legal standard to the question of entitlement to certain treatment recommended by Dr. Callender, which included a CPAP machine for the treatment of sleep apnea and Lmedication. Specifically, Langley asserts that the workers’ compensation judge erroneously required that he prove he had “physical impairments” in order to be entitled to medical treatment. Langley asserts that the Workers’ Compensation Act requires only that the medical treatment be reasonable and necessary.
The workers’ compensation judge held that “the evidence does not support claimant’s contention that he suffers from chronic residual physical impairments as a direct result of the EDC exposure of October 6, 1996,” i.e., there was no causation between any continued physical impairments Langley might have and the EDC exposure. La.R.S. 23:1203(A) does require the employer to furnish all necessary medical treatment, which presupposes that an actual condition exists to treat. Dr. Cal-lender testified about Langley’s medical problems and about the necessity of continued treatment, including the CPAP machine and medication. However, a claimant must also prove a causal connection between the treatment and the work accident. Scherer v. Interior Plant Design, 98-702 (La.App. 3 Cir. 10/28/98), 724 So.2d 797, writ denied, 99-0297 (La.3/26/99), 739 So.2d 792. Because the workers’ compensation judge found no causation, she did not have to reach the issue of medical necessity. Therefore, she did not apply an incorrect legal standard.
In any event, Langley contends that the workers’ compensation judge *1102 failed to apply the appropriate presumption of causation where he was in good health prior to the EDC exposure but developed certain medical conditions after the EDC exposure. It is well settled that a claimant’s disability is presumed to have resulted from a work accident if before the accident the claimant was in good health but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves thereafter, providing either that there is sufficient medical ^evidence to show a reasonable possibility of a causal connection between the accident and disabling condition or that the nature of the accident, when combined with the other facts of the case, raises a natural inference through human experience of a causal connection. Walton v. Normandy Village Homes Ass’n, Inc., 475 So.2d 320 (La.1985). Once the disabled employee establishes the presumption, the employer bears the burden of producing evidence and the burden of persuasion on the issue. Id.
Langley testified that he did not have any problems prior to working for Larco, and his wife’s testimony corroborated this testimony. Additionally, Dr. Cal-lender was of the opinion that Langley’s problems, i.e., peripheral polyneuropathy, dysfunction of the central nervous system, chronic nasosinusitis with obstructive sleep apnea, chronic dermatitis, and cracked skin, were either caused by or significantly contributed to by EDC.
On the other hand, Dr. Swift found that Langley’s escalating symptoms, both in their severity and quantity, were inconsistent with ongoing EDC toxicity. Dr. Swift was of the opinion that there was no evidence of active toxicity from EDC. Moreover, Dr. Tamimie found somewhat exaggerated responses on examination of Langley. He found no objective abnormalities to substantiate that Langley continued to suffer from exposure to EDC. Dr. Tamimie testified that the fact that there were no abnormalities on the physical exam was inconsistent with Langley’s complaints. Additionally, Dr. Vitrano did not find that Langley suffered from any chronic residual physical impairments as a direct result of the EDC exposure. Also, Dr. Aurich reported that test results on malingering measures called into question Langley’s motivation. Further, while Langley did have a positive polysomno-gram indicating ^obstructive sleep apnea, both Dr. Swift and Dr. Vitrano explained that Langley had a very common cause for sleep apnea — excessive weight. At the time of Dr. Swift’s exam, Langley measured five feet, nine and a half inches tall and weighed 285 pounds. Dr. Swift, Dr. Vitrano, and Dr. Tamimie were of the opinion that the sleep apnea was not related to the chemical exposure.
The issue of causation is an issue of fact. Edwards v. Sawyer Indus. Plastics, Inc., 99-2676 (La.6/30/00), 765 So.2d 328. In Edwards, the supreme court stated:
The workers’ compensation officer’s factual findings are subject to the manifest error standard of appellate review. Bruno v. Harbert Int'l, Inc., 593 So.2d 357 (La.1992). In Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973), this court defined that standard in the following manner:
When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court’s finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of *1103 credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court’s better capacity to evaluate live witnesses (as compared with the appellate court’s access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.
Id. at 332-33.
Additionally, the supreme court has explained that “[t]he rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound.” Lirette v. State Farm Ins. Co., 563 So.2d 850, 853 (La.1990).
In Edwards, the employee claimed that he sustained physical disability caused 19by workplace exposure to styrene, a known neurotoxin, which he handled on a daily basis for over a year. In determining that the employee’s medical problems were caused by exposure to styrene, the workers’ compensation judge relied primarily on the testimony of the treating physician.[3] The court of appeal reversed, holding that the employee failed to meet his burden of proving that his disabling condition was caused by exposure to toxic chemicals on the job. The supreme court reversed the court of appeal, stating:
On this record, although there was substantial evidence on which the trier of fact could have reached a contrary conclusion, we cannot say that there was insufficient support for the conclusion that the trier of fact did reach. We therefore set aside the judgment of the court of appeal and reinstate the decision of the trier of fact as to causation.
Edwards, 765 So.2d at 333.
In the instant case, the medical evidence was conflicting on the issue of whether Langley continued to suffer from chronic residual physical impairments as a result of the EDC exposure. As in Edwards, there was substantial evidence upon which the workers’ compensation judge could have reached a contrary conclusion, and we could have readily affirmed such a decision. In fact, had we been sitting as the trier of fact, we might have weighed the evidence differently in favor of Langley. However, we cannot say that there was not substantial evidence upon which the workers’ compensation judge could have reached the conclusion that she reached. Specifically, the workers’ compensation judge was faced with evidence calling into question Langley’s motivation and effort. Additionally, she had before her the IME opinion of Dr. Tamimie, appointed by the OWC director pursuant to La.R.S. 23:1123, that there was no causation between any continued complaints and the EDC exposure. |inWe are aware of the tenet that, normally, the treating physician’s testimony is given substantial weight, but, additionally, the OWC-appointed expert’s opinion must be considered as prima facie evidence of the facts stated therein pursuant to La.R.S. 23:1123. See Fritz v. Home Furniture-Lafayette, 95-1705 (La.App. 3 Cir. 7/24/96), 677 So.2d 1132. Further, the workers’ compensation judge had before her the IME opinion of Dr. Vitrano, appointed by her pursuant to La.R.S. 23:1124.1, also to the effect that there was no causation between any continued complaints and the EDC exposure. Based on the record evidence reviewed in its entirety, we cannot say that the workers’ compensation judge was clearly wrong *1104 in finding no continuing disability caused by the EDC exposure. There are simply two permissible views of the evidence in this case, and “[w]here there are two permissible views of the evidence, a factfin-der’s choice between them can never be manifestly erroneous or clearly wrong.” Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840, p. 8 (La.7/1/97), 696 So.2d 551, 556.
Langley also contends that the workers’ compensation judge erred in failing to consider the issue of supplemental earnings benefits. The judge’s failure to address this demand in the judgment is tantamount to a rejection of it. See Ring v. Decor Gravure Corp., 99-1965 (La.App. 3 Cir. 6/7/00), 768 So.2d 116, writ denied, 00-2053 (La.10/6/00), 771 So.2d 89. As set forth above, LWCC paid weekly indemnity benefits for the period from January 6, 1997 through September 9, 1997. Dr. Swift examined Langley on May 30, 1997, and testified that he did not see any reason to restrict Langley’s work on the basis of the exposure episode of October 6, 1996. Additionally, following his examination of August 26, 1997, Dr. Tamimie was of the opinion that Langley would be able to return to work and pursue his employment. lnBased on the opinions of these two physicians, we find no manifest error in the workers’ compensation judge’s failure to award supplemental earnings benefits after September 9, 1997.
In any event, Langley contends that he is entitled to supplemental earnings benefits for the period of October 6, 1996 through January 5, 1997. Dr. Drum-wright placed Langley on light-duty status for the week following the incident, and then he returned to regular duty. Payroll records reflect that during this period Langley was paid for at least forty hours a week, for all but four of the weeks, at the same pay rate. He worked 34.74 hours in one of those four weeks (for the week ending October 27, 1996), 35.17 hours in another (for the week ending November 17, 1996), 36.87 in another (for the week ending December 1, 1996), and 32.83 in another (for the week ending January 5, 1997). The record does not reveal that, during this period, Langley was unable to earn wages equal to ninety percent or more of his preaccident wages as a result of his work injury as required by La.R.S. 23:1221(3)(a). Thus, the workers’ compensation judge correctly rejected Langley’s claim for supplemental earnings benefits for the period from October 6, 1996 though January 5, 1997.
Langley has also assigned as error the workers’ compensation judge’s failure to award penalties and attorney fees. Because we find no error in the judge’s rejection of the claim for supplemental earnings benefits, concomitantly, we find no error in her rejection of the claim for penalties and attorney fees for LWCC’s failure to pay those benefits for the periods from October 6, 1996 through January 5, 1997, and for the period after September 9, 1997. However, we do find error in the workers’ compensation judge’s failure to award penalties and attorney fees for the late payment of indemnity benefits due for January of 1997. Pursuant to La.R.S. | i?23:1201(B), “[t]he first installment of compensation payable for temporary total disability ... shall become due on the fourteenth day after the employer or insurer has knowledge of the injury ... on which date all such compensation then due shall be paid.” LWCC did not issue payment for the periods beginning January 13, 1997, and January 20, 1997, until February 5, 1997. Additionally, LWCC did not issue payment for the period beginning January 6, 1997, until February 18, 1997. LWCC did not reasonably controvert this claim. Therefore, pursuant to La.R.S. *1105 23:1201(F), we award Langley $2,000.00 in penalties and $1,000.00 in attorney fees.
DISPOSITION
For the foregoing reasons, we reverse the denial of penalties and attorney fees for the failure to timely pay temporary total disability benefits and award Leo Langley $2,000.00 in penalties and $1,000.00 in attorney fees. We affirm the judgment below in all other respects. We assess fifty percent of the costs of this appeal to Leo Langley and fifty percent to Larco Environmental Services, Inc. and Louisiana Workers’ Compensation Corporation.
REVERSED IN PART AND RENDERED; AFFIRMED IN PART.

. La.R.S. 23:1123 provides:
If any dispute arises as to the condition of the employee, the director, upon application of any party, shall order an examination of the employee to be made by a medical practitioner selected and appointed by the director. The medical examiner shall report his conclusions from the examination to the director and to the parties and such report shall be prima facie evidence of the facts therein stated in any subsequent proceedings under this Chapter.

. La.R.S. 23:1124.1 provides:
Neither the claimant nor the respondent in hearing before the workers’ compensation judge shall be permitted to introduce the testimony of more than two physicians where the evidence of any additional physician would be cumulative testimony. However, the workers’ compensation judge, on his own motion, may order that any claimant appearing before it be examined by other physicians.

. Dr. Callender was also the treating physician in Edwards.