796 So.2d 772 (2001)
Connie GUILLORY
v.
WAL-MART STORES, INC.
No. 01-127.
Court of Appeal of Louisiana, Third Circuit.
October 3, 2001.
Michael W. Robinson, Pucheu, Pucheu, & Robinson, Eunice, LA, Counsel for Plaintiff/Appellant Connie Guillory.
Frank A. Flynn, Allen & Gooch, Lafayette, LA, Counsel for Defendant/Appellee Wal-Mart Stores, Inc.
*773 Court composed of HENRY L. YELVERTON, BILLIE COLOMBARO WOODARD, and MICHAEL G. SULLIVAN, Judges.
SULLIVAN, Judge.
Connie Guillory Kennedy appeals the dismissal of her workers' compensation claim based upon a finding that she failed to prove her present symptoms were the result of a work-related accident.[1] For the following reasons, we affirm.

Discussion of the Record
Mrs. Kennedy alleges that she injured her neck and upper back on November 4, 1995, as she lifted a seventy-five pound mixing bowl while working in the bakery department of the Wal-Mart store in Jennings, Louisiana. She reported that her back was hurting to her immediate supervisor, but she completed her shift that day. The next day, she could not complete her shift, and an accident report was prepared with the notation that she reported pain in the "mid to lower back (left side)" while "lifting up on the mixing bowl." (Emphasis added.) She did not report to work again after November 5, 1995.
On Monday, November 6, 1995, at Wal-Mart's recommendation, Mrs. Kennedy was seen by Dr. John Sebatier, who diagnosed a thoracic muscle strain. Dr. Sebatier advised no lifting or straining for five days and recommended a return visit the following Friday.
On November 7, 1995, Mrs. Kennedy was seen by a physician of her choosing, Dr. Bobby Deshotel. At this visit, Mrs. Kennedy reported that she developed a sharp pain in her upper back while picking up a heavy mixing bowl. Dr. Deshotel noted tenderness in the upper back that went through the left shoulder and arm. With a diagnosis of cervical/thoracic radiculitis on the left, he prescribed anti-inflammatory and pain medication.
On Saturday, November 11, 1995, Mrs. Kennedy was involved in an unrelated accident in which the pickup truck she was driving rolled over into a ditch where it landed upside down. Mrs. Kennedy was temporarily suspended by her seat belt and then fell on her bottom before she was able to climb out of the vehicle. State Trooper Ross McCain, who investigated the accident, testified that the truck apparently rolled over at a slow speed when Mrs. Kennedy misjudged the edge of the ditch while making a U-turn. Neither Mrs. Kennedy nor her future husband, who was riding with her, reported any injuries, although Trooper McCain stated that Mr. Kennedy appeared "shaken up" and nervous. On his accident report, Trooper McCain noted light to moderate damage on the front and driver's side of the pickup truck.
Two days after this accident, on Monday, November 13, 1995, Mrs. Kennedy returned to Dr. Deshotel's office. At trial, she testified that she only accompanied her future husband, who needed some "nerve" medication, and that Dr. Deshotel did not examine her. However, Dr. Deshotel's office notes reflect that Mrs. Kennedy reported her back was still hurting, but now with pain in the mid back that goes into both arms and into her buttocks. In his deposition, Dr. Deshotel interpreted his notes as recording new complaints of pain that were not consistent with those of her first visit. Dr. Deshotel also testified that Mrs. Kennedy did not inform him of the rollover accident. He further stated that being tossed around in a truck, even at a *774 slow speed, could produce neck and back strains.
Dr. Deshotel continued to treat Mrs. Kennedy, prescribing different medications and physical therapy for neck and upper back pain, as well as for pain in the right arm that subsequently developed. He testified that he never received insurance approval for X-rays, an MRI, and a visit to a specialist of his recommendation. Dr. Deshotel believed that Mrs. Kennedy's upper back problems were consistent with a lifting, hyperextension injury, although he also stated a rollover accident could result in compression of the neck and thoracic spine. Concerning the symptoms switching from the left to the right side, Dr. Deshotel stated that a posterior disc injury could produce that result, but without a CT scan or other testing he could not make that diagnosis.
At Wal-Mart's request, Mrs. Kennedy was examined by Dr. James Perry, an orthopedic surgeon in Lake Charles, Louisiana, on January 22, 1996. Mrs. Kennedy reported that she experienced pain in her neck and right arm while lifting a seventy-five pound mixing bowl on November 4, 1995. She did not inform Dr. Perry of the rollover accident of November 11, 1995. Dr. Perry noted mild tenderness of the paraspinal muscles of the neck, but he found no neurological deficits or significant spasm. X-rays revealed minimal degenerative disc disease in the cervical spine and a normal thoracic spine. Dr. Perry diagnosed a probable neck sprain and recommended a work-conditioning program in preparation for a return to normal activities. He considered Mrs. Kennedy capable of sedentary to light duty at that time. When presented with a description of the rollover accident, Dr. Perry could not say which of her complaints resulted from either the lifting incident or the automobile accident. However, he did state that his diagnosis of a neck sprain would be consistent with a rollover accident and that it would have been reasonable for Mrs. Kennedy to report that accident to him in her patient history.
On December 1, 1997, Mrs. Kennedy was examined by Dr. John Clifford, a neurosurgeon. She complained of a constant burning pain in the neck that radiated to the right elbow. She also reported tingling and numbness of the fourth and fifth fingers on the left hand. She related her symptoms to the accident at Wal-Mart, and again, she did not mention the rollover accident. Dr. Clifford noted that she held her right hand in a clawlike position for which he found no physiological reason. He also found no atrophy or weakness of the upper extremities. Although some of her complaints suggested a C7 radiculopathy, Dr. Clifford found no physical findings of a pathology in that area. He believed Mrs. Kennedy to be a significantly depressed patient who was somaticizing many of her symptoms. He did recommend that she undergo EMG testing.
On February 24, 1998, Mrs. Kennedy was seen by another neurosurgeon, Dr. William Foster. She told Dr. Foster that she has been unable to work since the accident at Wal-Mart due to neck pain, right arm pain, and, to a lesser extent, mild radicular pain on the left. She informed Dr. Foster of the rollover accident, but stated that it did not result in additional injuries or an aggravation of her previous complaints. In his examination, Dr. Foster noted tenderness over the medial scapular border and over the cervical and thoracic spines, with a slight drift of the right arm and weakness of the right hand grip as compared to the left. He also noted a diminished radial pulse on the right upon hyperabduction and left lateral rotation of the cervical spine. Dr. Foster explained that this last finding, called a *775 positive Adson's maneuver, is one component of thoracic outlet syndrome (TOS), or the compression of the neurovascular system in the anterior cervical region. Because Mrs. Kennedy's symptoms could be suggestive of a C8 radiculopathy, TOS, or an ulnar neuropathy, Dr. Foster recommended an MRI and EMG. Performed in March of 1998, these tests revealed an osteophyte at C5-6, mild C7 nerve root irritation on the right, and mild carpel tunnel syndrome (CTS). Because these results did not suggest a C8 root compression or an ulnar neuropathy, Dr. Foster believed the most likely diagnosis was TOS, particularly with the finding of a diminished radial pulse. He believed that Mrs. Kennedy was capable of sedentary to light activity, and he recommended an evaluation for TOS surgery. He did not believe that the CTS, which had been asymptomatic, was related to her lifting injury.
In November of 1998, Mrs. Kennedy underwent a myelogram and post-myelogram CT scan. The myelogram revealed a right lateral extra dural defect at C7-T1, which, according to Dr. Foster, would explain her C8 dermatome symptoms. However, the CT scan showed no evidence of nerve root compression in that area. Dr. Foster nonetheless believed that Mrs. Kennedy did have a C8 nerve root problem as well as TOS.
On January 8, 1999, Mrs. Kennedy returned to Dr. Clifford, complaining of persistent pain from the base of the skull to the neck and through the right arm. Upon examination, Dr. Clifford noted soreness of the paracervical muscles, but he did not detect the diminished radial pulse in the Adson's maneuver as Dr. Foster had. After reviewing the myelogram and CT scan, Dr. Clifford did not consider Mrs. Kennedy to be a surgical candidate, particularly as the C7-T1 nerve root filled normally on the CT scan. He believed that Mrs. Kennedy suffered from musculoskeletal pain of an undetermined etiology and from depression.
Mrs. Kennedy was also examined by Dr. Anthony Ioppolo, a neurosurgeon practicing in Baton Rouge, Louisiana, on October 19, 1999. According to Dr. Ioppolo, the myelogram and CT scan did not show any nerve root impingement. He did not believe that Mrs. Kennedy had any type of surgically significant problem in the neck, but he did suggest a Functional Capacity Evaluation in an effort to return her to gainful employment. Dr. Ioppolo stated that he did not specifically test for TOS and that he would need a further work-up to express an opinion in that regard. When asked about the causation of Mrs. Kennedy's problems, he noted that her neck and upper back symptoms predated the rollover accident by seven days.
On January 6, 2000, Dr. Foster ordered a second EMG to be performed by Dr. Kevin Gorin. Dr. Gorin's report noted some C7 and C8 irritability, but without an active cervical radiculopathy, and a right ulnar compression above the shoulder suggestive of right TOS. Dr. Foster also referred Mrs. Kennedy to Dr. Dean Moore, a neurosurgeon specializing in TOS. Dr. Moore concluded that Mrs. Kennedy had a herniated disc at C7-T1 as well as right TOS. Dr. Foster then recommended two surgical procedures: first, a foraminotomy to correct the defect at C7-T1, which he believed was impinging the C8 nerve, and, second, surgery for TOS, which would be performed by Dr. Moore.
Dr. Foster related Mrs. Kennedy's C8 problems to the Wal-Mart accident based upon the history of the onset of symptoms. However, Dr. Foster also recognized that a vehicle rollover was a "pretty serious" situation, and he stated that he was surprised it did not result in any additional *776 problems or treatment. Given the proximity of the two accidents, Dr. Foster stated that he had to rely on the patient's history in concluding which accident caused the symptoms.
Mrs. Kennedy had also been involved in another motor vehicle accident approximately ten years before the Wal-Mart incident, on April 21, 1986, when an eighteen-wheeler rear-ended her car. She sustained a whiplash type injury that produced pain in her neck, shoulders, and left arm, with reports of the left arm going numb all the way to the hand. When an MRI after that accident revealed no degenerative changes or protrusions, her treating orthopedist, Dr. Dale Bernauer, diagnosed a cervical and thoracic strain for which he continued to treat her through January 1, 1988. In January of 1993, she reported a recurrence of neck pain to another physician, Dr. Louis Shirley, who diagnosed an acute inflammation or "wry neck." Mrs. Kennedy also reported to Dr. Ioppolo that her neck continued to hurt after this accident, but that the pain worsened and was on the right side, as opposed to the left, after the Wal-Mart accident.
At trial, Mrs. Kennedy maintained that the rollover accident did not result in any new symptoms. She testified that she did not seek medical treatment from Dr. Deshotel after that accident, but instead only accompanied her husband to get nerve medication. She also testified that the initial reports of her injury, including the Wal-Mart accident reports and Dr. Deshotel's notes, should have reflected that she described left sided pain that radiated to the right.
Wal-Mart paid Mrs. Kennedy workers' compensation benefits and medical expenses through January of 1996. Thereafter, Mrs. Kennedy paid for her continuing medical treatment with Dr. Deshotel and Dr. Foster. From 1997 through 1999, Mrs. Kennedy attended technical college, obtaining a certificate that would qualify her for a secretarial position. After completing that course, however, she did not seek employment in that field. At trial, she testified that she wishes to return to school to become a licensed practical nurse (LPN).
After taking the matter under advisement, the workers' compensation judge issued written reasons finding that Mrs. Kennedy failed to prove that the accident at Wal-Mart was the cause of her disability. In reaching this conclusion, the workers' compensation judge cited Mrs. Kennedy's visit to Dr. Deshotel just two days after the rollover accident and her failure to inform Dr. Deshotel and other providers of that accident.

Opinion
On appeal, Mrs. Kennedy assigns eight errors, many of which concern the workers' compensation judge's evaluation of the lay and medical testimony adduced at trial. In her seventh assignment of error, she argues that the workers' compensation judge improperly required her to prove "that the subsequent accident was not an intervening cause." Because this argument may affect our standard of review, we will address it first.
Factual findings in a workers' compensation case, such as causation, are subject to the manifest error standard of review. Edwards v. Sawyer Indus. Plastics, Inc., 99-2676 (La.6/30/00), 765 So.2d 328; Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840 (La.7/1/97), 696 So.2d 551. However, where the fact-finding process has been interdicted by legal error in the trial court, the manifest error standard is no longer applicable and the appellate court should make a de novo review of the record and render judgment, *777 provided that the record is otherwise complete. Evans v. Lungrin, 97-541, 97-577 (La.2/6/98), 708 So.2d 731. Mrs. Kennedy argues that the workers' compensation judge committed such a legal error by requiring her to prove that her work-related accident was the cause of her disability. For the following reasons, we disagree.
In Ceasar v. Crispy Cajun Restaurant, 94-30, p. 7 (La.App. 3 Cir.10/5/94), 643 So.2d 471, 476-77, writ denied, 94-2736 (La.1/6/95), 648 So.2d 931, we summarized the jurisprudence concerning causation in workers' compensation cases as follows:
"A claimant's disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition." Bruno [v. Harbert Intern. Inc., 593 So.2d 357 (La.1992) ] at 363 (citing West [v. Bayou Vista Manor, Inc., 371 So.2d 1146 (La.1979) ] at 1149 and Lucas v. Insurance Company of North America, 342 So.2d 591, 596 (La. 1977)). "When there is proof of an accident and of a following disability, without an intervening cause, it is presumed that the accident caused the disability." Coley v. Wilson Oil Co., Inc., 620 So.2d 445, 450 (La.App. 3d Cir.1993). Once a claimant proves an accident occurred followed by a disability, the burden shifts to the employer and his insurer to prove the absence of a causal connection between the accident and the injury. Bruno v. Guaranty Bank & Trust Co., 617 So.2d 1351 (La.App. 3d Cir.1993).
In addition to her accident at Wal-Mart, Mrs. Kennedy was in two other accidents: a rear-end collision with an eighteen-wheeler almost ten years before the Wal-Mart accident and a vehicle rollover seven days after the work-related accident. The presumption of causation can apply to a claimant who has exhibited symptoms in the distant past, provided that he has suffered no such symptoms immediately prior to the work-related accident. Rideaux v. Franklin Nursing Home, 95-240 (La.App. 3 Cir. 11/22/95), 664 So.2d 750, writ denied, 95-3093 (La.2/16/96); 667 So.2d 1058. In the eighteen-wheeler accident, Mrs. Kennedy sustained injuries to her upper back and neck with some symptoms in the left arm. These symptoms were similar to those initially recorded in Wal Mart's accident reports and at Mrs. Kennedy's first visit to Dr. Deshotel. In Dr. Ioppolo's report, he noted that Mrs. Kennedy indicated that "her neck continued to hurt from that [eighteen-wheeler] accident but with the current [Wal-Mart] accident, the pain is worse and on the right side not the left." (Emphasis added.) Additionally, Mrs. Kennedy's right-sided complaints were not documented until after the rollover accident. Given the evidence of continued complaints between the first two accidents and the occurrence of the third, we find that Mrs. Kennedy was not entitled to a presumption of causation. Accordingly, we find that the workers' compensation judge did not apply an incorrect burden of proof and that the proper standard of review is manifest error.
In Edwards, 765 So.2d at 333 (quoting Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973)) the supreme court again set forth the principles of manifest error:
When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in *778 the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.
In her remaining assignments of error, Mrs. Kennedy essentially argues that the workers' compensation judge erred in failing to consider the totality of the evidence, in particular: by focusing on only one aspect of Dr. Deshotel's testimony that was taken out of context; by imposing the burden of proving "fraud" on the part of Dr. Deshotel; by not considering the lay evidence indicating that the rollover accident played no part in causing her disability; and by not considering the testimony of Mrs. Kennedy's treating physicians, particularly Dr. Foster, on the question of causation.
The workers' compensation judge focused on Dr. Deshotel's notes of November 13, 1995 because that was the office visit in closest proximity to the rollover accident. As Dr. Ioppolo explained in his deposition, if a patient experiences new symptoms or an increase in symptoms after an automobile accident, then that would be an indication of some connection between that accident and subsequent symptoms. In his deposition, Dr. Deshotel stated that Mrs. Kennedy's symptoms on November 13, 1995 were the same for her neck and upper back, but that she made new complaints of lower back pain and pain in both arms. Previously, her documented complaints had only been on the left side. In an "Associate Statement" that Mrs. Kennedy completed on November 6, 1995, she wrote that she injured her "back (left side)" while picking up a mixing bowl. On that statement, she also indicated that she had not injured that area of her body before, even though she had experienced neck, upper back, and left-sided pain in the eighteen-wheeler accident. The employer's report of occupational injury completed by Wal-Mart's assistant manager, John Rivette, also states: "Pain in the mid to lower back (left side)." On her first visit to Dr. Deshotel, he recorded complaints of pain in the upper back thoracic area that goes to the left side. When she returned seven days later, she did not inform him of the rollover accident that occurred two days before that visit.
At trial, Mrs. Kennedy testified that the accident report and Dr. Deshotel's initial notes should have reflected that her pain began on the left side but radiated to the right. She also disputed Dr. Deshotel's notes of November 13, 1995, testifying that she only accompanied her husband to the doctor's office that day. We can find no error in the workers' compensation judge's reliance on contemporaneously written documents rather than Mrs. Kennedy's recollection of those events several years later, particularly when Mrs. Kennedy did not give a full account of her medical history at the time those documents were prepared. We further find that the workers' compensation judge did not impose upon Mrs. Kennedy the burden of proving that Dr. Deshotel prepared a fraudulent medical report. The reference to fraud in the written reasons for judgment was made only as the workers' compensation judge expressed her difficulty in reconciling Mrs. *779 Kennedy's trial testimony with Dr. Deshotel's office notes.
Mrs. Kennedy also argues that the workers' compensation judge erred in not considering Dr. Foster's opinion that the Wal-Mart accident caused her present symptoms and in not considering the physical evidence indicating that the rollover accident played no part in her present disability. In the first of his two depositions, Dr. Foster stated that his opinion was based upon the history provided by Mrs. Kennedy, i.e., that the rollover accident did not create any new or aggravated symptoms and that she did not require any medical treatment from it. Although Dr. Foster had no reason to disbelieve Mrs. Kennedy, he also stated that a history of no new problems would be unusual in a rollover accident. He further explained that if a person went to a doctor's office two days after such an incident, he would be suspicious that the medical treatment was related to the rollover. In his second deposition, Dr. Foster said that there really was no way to identify the source of Mrs. Kennedy's pain without relying on her history. Additionally, Dr. Deshotel testified that, even at a low speed with the occupants wearing their seatbelts, a rollover situation could result in compression of the spine.
As the supreme court explained in Stobart v. State, through the Dep't of Transp. & Dev., 617 So.2d 880, 882 (La.1993) (citations omitted):
[T]he issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony.
On the record before us, we cannot conclude that the workers' compensation judge's ruling was unreasonable.

Decree
For the above reasons, the judgment of the Office of Workers' Compensation is affirmed. Costs of this appeal are assessed to Connie Guillory Kennedy.
AFFIRMED.
NOTES
[1] At the time this suit was filed, the claimant had not yet married her current husband, Keith Kennedy. However, we will refer to her as "Mrs. Kennedy" throughout the opinion.