DREW, J.
 

 hln this workers’ compensation proceeding, Foster Farms and Ohio Casualty Insurance Company appeal a judgment ordering them to pay supplemental earnings benefits, medical expenses, a penalty, and attorney fees.
 

 We affirm.
 

 FACTS
 

 Robert Davenport was employed as a floor man at a Pilgrim’s Pride poultry processing plant in Union Parish.
 
 [1]
 
 Davenport lost his job on May 6, 2009, when the Pilgrim’s Pride plant closed. Shortly thereafter, Foster Farms began operating the plant, and on July 16, 2009, Davenport resumed his employment there as a floor man. His job duties as a floor man included placing ice in tubs that were being filled with chicken parts, stacking the tubs, and moving the tubs onto a pallet in a chiller room.
 

 Davenport contended that shortly after his shift began on the evening of August 5, 2009, he injured his back while lifting heavy, wet pallets. There were no witnesses to the incident.
 

 Davenport stopped his supervisor, Bradley Issac,
 
 [2]
 
 who was walking through the chiller room, and told him that he felt a sharp pain in his back and needed to go to a doctor. Davenport stated that Issac told him to take some Tylenol and wait for the nurse, who was to arrive at the plant in 30 minutes. Under company policy, any employee injured at work must immediately report it to his supervisor and then to the nurse. Davenport [2also stated that Issac told him that he would be fired if he clocked out without first seeing the nurse.
 

 Davenport and Issac met in the plant office, where Issac again attempted to convince Davenport to wait for the nurse. Davenport left the plant and went to the Emergency Room at E.A. Conway Hospital (“Conway”) in Monroe.
 

 Davenport returned to work the following day with a doctor’s report. Issac instructed Davenport to keep the report, asked for his badge, and told him that he was suspended pending an investigation. Foster Farms ultimately fired Davenport.
 

 On September 1, 2009, Davenport filed a disputed claim for compensation in which he alleged that he felt a sharp pain in his back while moving pallets at work on August 5, 2009. Following a trial on the merits, the WCJ rendered judgment in favor of Davenport, finding that he was entitled to supplemental earnings benefits from May 10, 2010, which was the week following termination of his unemployment benefits; to payment of medical expenses reasonably related to his injury; and reimbursement of all out-of-pocket expenses reasonably related to his injury. Foster Farms and Ohio Casualty were assessed with a penalty of $2,000 for failing to pay benefits or reasonably controvert the claim for compensation, and were ordered to pay
 
 *1266
 
 $7,500 in attorney fees. Foster Farms and Ohio Casualty appeal.
 

 ^DISCUSSION
 

 Accident
 

 Foster Farms and Ohio Casualty contend the WCJ erroneously found that Davenport suffered an accident in the course of work on August 5, 2009.
 

 Factual findings in workers’ compensation cases are subject to the manifest error or clearly wrong standard of appellate review.
 
 Dean v. Southmark Constr. Co.,
 
 2003-1051 (La.7/6/04), 879 So.2d 112;
 
 Banks v. Industrial Roofing & Sheet Metal Works, Inc.,
 
 96-2840 (La.7/1/97), 696 So.2d 551. To reverse a factfinder’s determination under this standard of review, an appellate court must undertake a two-part inquiry: (1) the court must find from the record that a reasonable factual basis does not exist for the finding of the trier of fact; and (2) the court must further determine the record establishes the finding is clearly wrong.
 
 Stobart v. State, Department of Transportation and Development,
 
 617 So.2d 880 (La.1993). Ultimately, the issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one.
 
 Id.
 
 If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.
 
 Id.
 
 When there are two permissible views of the evidence, a factfinder’s choice between them can never be manifestly erroneous or clearly wrong.
 
 Winford v. Conerly Corp.,
 
 2004-1278 (La.3/11/05), 897 So.2d 560.
 

 14A claimant in a workers’ compensation action must establish “personal inju-
 

 ry by accident arising out of and in the course of his employment.” La. R.S. 23:1031(A). An accident is “an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration.” La. R.S. 23:1021(1). An employee may prove by his or her testimony alone that an unwitnessed accident occurred arising out of and in the course of employment if the employee can satisfy two elements: (1) no other evidence discredits or casts serious doubt upon the worker’s version of the incident; and (2) the worker’s testimony is corroborated by the circumstances following the alleged accident.
 
 Bruno v. Harbert Intern. Inc.,
 
 593 So.2d 357 (La.1992).
 

 Davenport at first testified that he never told Issac that his pain was caused by an accident at work because he had not been involved in an accident. He told Issac only that his back had started hurting and he needed to see a doctor. However, when later asked if it was during his first conversation with Issac that he reported that he had hurt his back while lifting pallets, Davenport replied, “Exactly, that’s correct.”
 

 Issac testified that Davenport said only that his back was hurting, but never said how he had hurt it. However, Issac never asked Davenport why his back was hurting. Chris Jernigan, a live receiving supervisor at the plant, was in the office and overheard part of the conversation between Davenport and Issac. He heard Davenport say that his back was hurting and Rhe was going home. Jernigan recalled that Davenport never indicated that he hurt his back while doing his job at Foster Farms.
 

 
 *1267
 
 Foster Farms and Ohio Casualty argue that additional evidence discredited Davenport’s version of what caused his back pain, and that his testimony was not corroborated by the circumstances following the alleged accident. In particular, they point out that Davenport failed to report his injury as work-related, he had preexisting lower back pain and denied having been treated for lumbago, he failed to disclose his back condition on a Foster Farms health questionnaire, and he attempted to receive unemployment compensation benefits through fraud.
 

 When Davenport was treated at Conway on the night of the accident, he described the pain as sharp and constant, and that it worsened when lifting. The emergency room report shows that he reported back and shoulder pain that began a year earlier. Davenport denied telling the doctors this pain had lasted one year; rather, he said he told the doctors only that he had had back and shoulder pain before. He also asserted that a physician at the hospital completed the report. Davenport also testified that he told the doctors at Conway that he sustained a work injury, but they did not write it down in the report.
 

 Davenport was treated the next day by Dr. Khaled Shafiei, an internal medicine physician in Monroe. He complained of lower back pain, but the report from that visit does not reflect that his pain was caused by a work accident. Davenport testified that he told Dr. Shafiei on that visit what had | (¡happened to his back at work, but the doctor forgot to write this down. Dr. Shafiei restricted Davenport from heavy lifting.
 

 Davenport returned to Conway for treatment on August 11, 2009. It was noted that Davenport described his back pain as aches that were constant and began a year earlier. Davenport testified that this notation was wrong. An MRI of Davenport’s lumbar spine performed on that date showed mild straightening of the normal curvature possibly secondary to muscle spasm. The MRI also showed that degenerative disc and arthritic changes were present to a moderate degree, especially in the upper lumbar spine.
 

 Davenport was again treated at Conway on September 16, 2009. He reported low back pain with an onset date of August 5, 2009. He described his pain as coming and going, and that it felt like a screwdriver was going in his back.
 

 Davenport returned to Conway for a followup visit on November 25, 2009, when it was recorded that he reported hurting his back while lifting at work on August 5, 2009. Davenport testified that like the other medical reports, he did not fill out the November 25 report. An MRI of the lumbar spine taken later that November showed mild degenerative disc and joint disease mainly at L3-4 and L5-S1.
 

 Davenport was again treated for back pain at Conway on February 17, 2010. An MRI of his lumbar spine taken five days later showed degenerative disc changes at the Ll-2 level and at the L4-5 and L5-S1 levels with slight posterior disc bulging.
 

 17Athough there was no mention of an accident at work in the earlier medical reports, Davenport explained that this information was omitted by the doctors who wrote the reports. It was on September 16 that the onset date of August 5 was first recorded in a medical report, and it was on November 25 that it was first recorded in a medical report that Davenport had been injured at work. However, we note the when Davenport filed his disputed claim for compensation on Septem
 
 *1268
 
 ber 1, he alleged that he felt a sharp pain in his back while moving pallets at work on August 5.
 

 Davenport clearly had a history of lower back pain. Medical billing records from 2003 show a diagnosis of lumbago. In January and September of 2008, and in June of 2009, he was treated by Dr. Shafiei for lower back pain. Dr. Shafiei recommended in June of 2009 that Davenport have a lumbar spine X-ray for the diagnosis of lower back pain. Davenport denied receiving medical treatment for lumbago in 2003, and he denied ever having lower back pain prior to the accident.
 

 Davenport admitted having back pain prior to the accident at work, but he said it was “not that much” and the pain that he experienced on August 5 was different and something that he had not felt before. Davenport stated that when he was treated by his doctor prior to August 5, it was for back pain that was very light. Davenport described the pain on August 5 as feeling like something was being screwed into his back.
 

 Davenport stated that his prior back pain had not prevented him from fulfilling his job responsibilities, he was not taking medication for it, and he had not injured his back on the job before. Jernigan recalled that Davenport 18always wore a back brace in the several years that he worked with him. However, Jernigan had never heard him previously complain of back pain.
 

 Issac had been Davenport’s supervisor when the plant was operated by Pilgrim’s Pride. Issac testified that when Davenport had complained about his back hurting in the past, he had always sent Davenport to see the plant nurse. Issac did not know when these instances took place, and he could not recall Davenport ever previously complaining about pain to the extent that he had to leave work. Issac also could not recall if Davenport had ever had any other injuries at work.
 

 When Davenport completed a medical history form for Foster Farms in July of 2009, he wrote “no” when asked if he had ever had problems with his back or neck. Davenport explained that at the time he had not had any serious problems with his back or neck. He also wrote “no” on the form when asked if he had any chronic back problems or back surgery.
 

 Finally, Davenport was informed in July of 2010 by the Louisiana Workforce Commission that he had received over $11,000 in unemployment benefits to which he was not entitled. He had been disqualified from unemployment benefits effective August 5, 2009. The overpayments were from August 8, 2009, through May 1, 2010.
 

 Davenport’s explanation for what happened regarding the unemployment benefits is unclear. He testified that he applied for unemployment benefits after being laid off by Pilgrim’s Pride, and the Workforce Commission disqualified him from benefits because it believed he walked off the job at Pilgrim’s Pride and had not been laid off. We note [3that the notices from the Workforce Commission state he was disqualified effective the date of the accident. We also note that the notices from the Workforce Commission are titled, with our emphasis added, “Determination of Overpayment (Non-Fraud).” The WCJ gave proper weight to the receipt of unemployment benefits, as Davenport was awarded supplemental earnings benefit beginning after the overpayments ceased.
 

 In
 
 Ardoin v. Firestone Polymers, L.L.C.,
 
 2010-0245 (La.1/19/11), 56 So.3d
 
 *1269
 
 215, the supreme court concluded the WCJ erred in finding Ardoin had injured his knee in an unwitnessed accident. Ardoin failed to report the accident to his employer for 18 months. Ardoin denied any falls or injuries when examined by his family physician the same month as his alleged accident. Nine months after the alleged accident, Ardoin did not indicate on Firestone’s Accident
 
 &
 
 Sickness program form that he had been in a work-related accident. It was more than a year after his alleged accident that Ardoin first indicated on the program form that he was unsure if his injury was work-related. When a Firestone occupational health nurse inquired about what he had meant, Ardoin explained that he was not sure what was going on with his knees. Of particular note is that when Ardoin was specifically asked within days or weeks of the alleged accident by Firestone’s safety manager whether he had suffered an accident at work, Ardoin denied injuring himself and only said that his knees were hurting.
 

 Davenport never denied any falls or injuries to Dr. Shafiei or when treated at Conway. He reported to his supervisor that his back was hurting immediately after he injured it, but unlike the Firestone safety manager, 1 inIssac never asked Davenport if he had injured his back doing something related to his job.
 

 The WCJ obviously believed Davenport’s assertion that he injured his back while lifting the pallets in an unwitnessed accident. The WCJ found that the medical evidence, and the testimony of Issac and Jernigan, corroborated Davenport’s version of the accident. The WCJ also found there was no evidence to cast serious doubt upon Davenport’s version of the accident.
 

 Based upon our review of this record, we conclude that the WCJ’s findings were reasonable. The WCJ was not manifestly erroneous in ruling that Davenport had injured his back in an accident at work on August 5, 2009, and was entitled to workers’ compensation benefits.
 

 Penalty and Attorney Fees
 

 La. R.S. 23:1201(F) provides for the assessment of penalties and attorney fees based on an employer’s failure to provide payment of benefits unless the claim is reasonably controverted or the failure to pay results from conditions over which the employer had no control.
 

 In order to reasonably controvert a claim, the defendant must have some valid reason or evidence upon which to base the denial of benefits.
 
 Koenig v. Christus Schumpert Health System,
 
 44,244 (La. App.2d Cir.5/13/09), 12 So.3d 1037;
 
 Howard v. Holyfield Construction, Inc.,
 
 38,728 (La.App.2d Cir.7/14/04), 878 So.2d 875,
 
 writ denied,
 
 2004-2303 (La.1/7/05), 891 So.2d 684.
 

 In We review the award of attorney fees and penalties under the manifest error standard.
 
 Morris v. Rent-A-Center, Inc.,
 
 43,191 (La.App.2d Cir.4/30/08), 981 So.2d 257.
 

 Issac testified that a representative from Human Resources talked to him the day after the accident and did a full report of the alleged injury. However, Issac could not recall if anyone from Human Resources ever asked him how Davenport had injured his back. A representative from Human Resources never asked Issac if Davenport went to see a doctor about his back. Issac did not know if Human Resources ever contacted Davenport to get his story about what had happened. Issac was also unsure how Human Resources conducted its investigation. His only in
 
 *1270
 
 volvement in any investigation by Human Resources was providing information about Davenport leaving work.
 

 Issac told Davenport when he returned to work the following day that someone from Human Resources would contact him if they needed to see his medical report. According to Davenport, Foster Farms never contacted him to investigate the accident or to inquire about any medical treatment that he may have received.
 

 The evidence shows that the imposition of a penalty and award of attorney fees was justified in this case as Foster Farms failed to reasonably controvert Davenport’s claim. Therefore, the WCJ was not manifestly erroneous in assessing a penalty of $2,000 against Foster Farms and Ohio Casualty, and awarding attorney fees of $7,500 to Davenport.
 

 | ^CONCLUSION
 

 At appellants’ costs, the judgment is AFFIRMED.
 

 [1]
 

 . He began working for Pilgrim’s Pride in 1999.
 

 [2]
 

 . Issac was also Davenport’s supervisor when he worked for Pilgrim’s Pride.