Judgment rendered November 16, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,789-WCA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

JULIUS HARPER                                    Plaintiff-Appellee

versus

WEYERHAEUSER COMPANY                      Defendant-Appellant

* * * * *

Appealed from the
Office of Workers' Compensation, District 2
Parish of Winn, Louisiana
Trial Court No. 20-00018

James L. Braddock,
Workers' Compensation Judge

* * * * *

GOLD, WEEMS, BRUSER,                      Counsel for Appellant
SUES & RUNDELL
By:  Steven M. Oxenhandler
     M. Allison Johnson

THE LAW OFFICE OF                          Counsel for Appellee
ALLEN COOPER, LLC
By:  James Allen Cooper, Jr.
     Joseph Christopher Miciotto

* * * * *

Before ROBINSON, HUNTER, and MARCOTTE, JJ.

**ROBINSON, J.**

In this workers' compensation action, Weyerhaeuser Company ("Weyerhaeuser") appeals a judgment ordering it to pay indemnity and medical benefits subject to a credit for short-term disability payments, awarding attorney fees, and assessing penalties. The claimant, Julius Harper, answers the appeal contending that Weyerhaeuser is not entitled to a credit for short-term disability payments. Harper also seeks an increase in attorney fees because of work required by the appeal, as well as additional penalties.

We reverse the judgment insofar as penalties were assessed and attorney fees were awarded. We also amend the judgment to require Weyerhaeuser to reimburse Harper for any short-term disability benefits that become subject to a lien from the disability insurer, The Hartford ("Hartford"). In all other respects, the judgment is affirmed.

## FACTS

Julius Harper, who was born in 1970, was employed as a saw file helper at the Weyerhaeuser sawmill located in Dodson, Louisiana. Harper began working at the sawmill in 2007.

Harper was off of work for parts of 2017 and 2018 because of low back pain. In January of 2018, he underwent a lumbar decompression and a lumbar discectomy. His surgeon released him to return to work without restrictions in April of 2018.

According to Harper, he was put on paid administrative leave for several weeks until he could be seen by Weyerhaeuser's physician. He told his pain management physician on May 29, 2018, that he had returned to full-time work.

On or about March 6, 2019, Harper was moving saw guides while helping to unload a gang saw at the sawmill. Harper estimated that each guide weighed between 20-25 pounds. Two additional Weyerhaeuser employees, Ronnie Alger and George Mercer, were working with Harper on the task. When Harper lifted up a guide in each hand from the deck and turned his body in order to lower the guides to the floor, he felt something pop in his back followed by a wave of pain. Harper immediately reported the accident to Robbie Tyler, who was the foreman over the saw room. Tyler then reported the accident to Jamie Ramier, the safety man. Harper went to the Louisiana Family Medicine Clinic ("clinic") on March 7 for treatment. Harper reported that he pulled something in his back while moving guides. He stated that his pain was 8/10. The clinic released him to return to work without restrictions.

Alger and Mercer provided statements to Weyerhaeuser following the accident. Alger stated that Mercer had been placing the guides on the deck and Harper was moving them to the floor. The distance from the deck to the floor was about three feet. As Harper moved guides to the floor, he stopped, made an audible noise, and stayed there. Alger asked Harper if he needed Alger to finish the task for him, and Harper replied in the negative and finished moving the guides. Alger remarked in his statement that he had been doing the job for more than a decade and he had never seen anyone else become injured while changing saws or guides.

Mercer stated that he was handing the guides down to Harper. Harper had already moved approximately 30-35 guides when Harper remained bent over after grabbing two guides from the deck and bending over to place them on the floor. When Alger and Mercer asked Harper if he was all right,

2

he responded that he felt something in his back pop. Mercer recalled that he finished moving the remaining guides while Harper stayed to the side. According to Mercer, Harper limped around for the rest of the day, claimed of pain since the incident, and told his coworkers that he felt like he has a baseball up against his spine.

Keith Holliman, the unit manager at the sawmill, prepared a written statement. He wrote that Harper came to his office on March 12, 2019. When Holliman inquired about his condition, Harper replied that he was in pain but would be all right. Harper added that he needed to get his pain management adjusted because it was no longer enough. Harper also stated that he believed Weyerhaeuser was going to fire him because he hurt all the time since his surgery. Harper quickly changed the subject when Holliman told him that he needed to speak with his physician immediately if he was working in pain all the time since the surgery.

On March 13, Harper was brought to the clinic by Scott Traweek, a dry end supervisor at the sawmill. He rated his lower back pain as a 9/10. A CT scan of his lumbar spine showed mild diffuse degenerative disk and arthritic changes, but there was no evidence of a compression fracture or subluxation. Harper was released to return to work with a light duty restriction and no lifting over 25 pounds.

Scott Traweek wrote a report when he returned to the facility. On the way to the clinic, Harper told him that his back pain was getting worse and he could no longer take it, he knew Weyerhaeuser would try to get rid of him, and that could not be sent home without pay and needed to be on workers' compensation or something. Once at the clinic, Harper told a nurse that Percocet was not working and he was taking two Flexeril at a time. The

nurse warned him not to take two pills at the same time. Harper said his pain level when he got to the clinic was a 9/10, but it decreased to a 7/10 after he received an injection for pain. Harper told the nurse to call his pain management physician to increase his pain medication and give him something stronger. Traweek recalled that on their way back to the sawmill, Harper mentioned that he was having to double up on his medications and did not have enough medication to make it through the rest of the month.

Weyerhaeuser's claims adjustor, Sedgwick Claims Management Services, Inc., was notified of the accident on March 14, 2019. Following the accident, Harper worked for five weeks sitting in the sawmill's office until he was told not to return unless fully released by his physician.

On December 30, 2019, Harper received a letter from Susan Wild, the Human Resources Manager at the sawmill. She wrote that Harper had been on continuous medical leave since April 10, 2019, and it was company policy to terminate an employee who has been on leave for nine months. Based on their understanding that Harper was physically unable to return to work, Weyerhaeuser would terminate him on January 13, 2020, if he was unable to return to work within a reasonable time.

***Pre-accident and post-accident medical history***

Harper went to the clinic on March 15, 2017, with complaints of lumbar pain. A CT scan done on August 11, 2017, showed herniation of disk material at L4-5 and bulging of disk material at L5-S1.

Harper went to the Emergency Room at Jackson Parish Hospital on May 6, 2017, complaining of the onset of severe pain in his lumbar spine that was radiating into his left leg. He explained that he had to leave work because he could no longer bear the pain.

4

Dr. Peter Campbell, a neurosurgeon, first examined Harper on November 9, 2017, when Harper presented with six months of severe back and leg pain. He also complained of shoulder pain, which another physician would later treat. Harper recorded his pain as being greater than 10/10 for the worst it would get. A lumbar spine MRI was performed on December 2, 2017, and it showed right-sided L5-S1 disk herniation versus disk bulge causing severe lateral stenosis, and degenerative disk disease at L4-5 with mild bilateral stenosis.

When Dr. Campbell examined Harper on January 4, 2018, Harper complained that he was also experiencing pain in his right leg as well. Dr. Campbell noted that he was going to refer Harper to pain management because Harper stated that two Percocet pills a day was not controlling his pain.

On January 22, 2018, Harper underwent a decompression at L4-5 and a right discectomy at L5-S1 performed by Dr. Campbell, who removed a disk herniation at L4-5. Harper would have another surgery on February 5, 2018, to mend a cerebrospinal fluid leak.

When Dr. Campbell next examined Harper on February 20, 2018, he reported that all of his left leg pain had resolved following the surgery, but he still had right leg pain and residual back pain.

Dr. Campbell saw Harper on March 30, 2018. While Harper had continued back and neck pain, Dr. Campbell did not think that Harper had any leg symptomology. Harper reported that he could only work around the house for about four hours before having to sit down and stop. Dr. Campbell noted the possibility that Harper had transitioned to a chronic pain phenotype; thus, he referred Harper to pain management for longer term

treatment. Although Dr. Campbell suspected that Harper would be unable to return to work because of the multiple foci of pain that he exhibited, he still released him to return to work without restrictions on April 9, 2018.

Harper was referred to Dr. Matthew Mosura for pain care management. Dr. Mosura first saw Harper on April 3, 2018. Harper reported having pain in his lower and upper back. He thought he had hurt his back while working on his car. He estimated his pain as being 8/10. Harper also said his leg pain had improved and had nearly resolved following surgery. Dr. Mosura's assessment was chronic low back pain despite the laminectomy, neck pain, and bilateral shoulder pain.

When Harper saw Dr. Mosura on April 24, 2018, he reported persistent pain in his lower back, neck, and shoulders. He told Dr. Mosura that he wanted to return to work but was waiting on Weyerhaeuser to send him to a physician for an evaluation.

Dr. Mosura met with Harper on May 29, 2018. Harper said his back pain was not better since the surgery; however, his leg pain had resolved. Harper was uninterested in another surgery unless his pain worsened a great deal. Harper told Dr. Mosura that he had returned to full-time work. He added that his Percocet dosage was not controlling the pain enough and it was difficult for him to get through the day, but he had to work to support his family.

Harper reported to Dr. Mosura on June 26, 2018, that Percocet was helping to keep him active. Harper told Dr. Mosura on September 25, 2018, that his lower back pain had worsened over the last month. Harper estimated his pain was 8/10. The next month, Harper told Dr. Mosura that his pain medications were controlling his pain and making it tolerable.

6

Harper gave a pain score of 10/10 when he was treated by Dr. Mosura on January 22, 2019. He stated he was doing well with the additional Percocet. His legs felt strong and he was able to walk and hunt. Dr. Mosura thought that Harper would likely require a fusion surgery but he was not interested in additional surgery if the pain could be managed through other means.

Harper saw Dr. Mosura for the first time following the accident on March 26, 2019. Harper explained that he felt a pop in his back when he picked up something at work. He complained of shooting pain in his back and numbness in his left leg. Harper stated that this pain was worse than the pain that he had experienced in the past and was now in his left leg. He also stated that the Percocet dosage was not helping.

Harper saw Dr. Campbell for the first time following the accident on April 16, 2019. He told Dr. Campbell that he was performing a twisting motion when he heard a loud pop in his lower back and nearly blacked out because the pain was so severe. Harper reported that pain was now constant and severe in his lower back as well as in his left leg.

A lumbar MRI done on April 23, 2019, showed degenerative disk disease at L4-5 and L5-S1. Harper also saw Dr. Campbell on that date. Dr. Campbell noted that Harper said that he did not plan on ever going back to work now that his back pain had become so severe.

When Dr. Campbell saw Harper on June 11, 2019, he explained to Harper that given his pain level, he would probably need a rod-and-screw arthrodesis procedure for his degenerative disk disease. Harper was not interested in that procedure at the time and wanted to continue with conservative management.

7

Harper complained to Dr. Mosura on July 30, 2019, that his pain was worse in the low back and that it radiated into his left buttocks and leg where it caused numbness.

On September 7, 2019, Harper rated his back pain as a 9/10 or 10/10 when seen by Dr. Campbell. On October 29, 2019, he described his pain to Dr. Mosura as throbbing and stabbing, and that it had worsened since his visit earlier that month. Harper told Dr. Mosura that he now had pain in both legs, but the pain in the right leg was not as severe.

When Dr. Campbell treated Harper on October 31, 2019, he noted that imaging showed a disk bulge at L5-S1 with an annular tear especially on the right side. Harper complained of bilateral leg pain and worsening back pain when he saw Dr. Campbell on January 7, 2020. Dr. Campbell noted that conservative treatment options had failed. A CT scan done on that date showed degenerative disk disease at L4-5 and L5-S1, and foraminal stenosis at L4-5 and L5-S1 based on bony overgrowth.

Harper told Dr. Mosura on February 11, 2020, that his pain had worsened. Dr. Mosura noted that there appeared to be a small annular tear at L5-S1 on the MRI taken on April 23, 2019. Harper indicated to Dr. Campbell on March 17, 2020, that he wanted to proceed with surgery.

A disputed claim for compensation was filed on January 2, 2020. Sedgwick Claims Management Services, Inc. was the administrator for the claim. Harper has not received workers' compensation benefits for this accident. He received short-term disability benefits for six months and then long-term disability benefits through November of 2020 from Hartford.

On behalf of Weyerhaeuser, Dr. Curtis Partington examined the lumbar MRIs taken on December 2, 2017, February 4, 2018, and April 23,

8

2019. His review was performed on December 10, 2020. Dr. Partington concluded that there has been no detrimental change in the appearance of the spine to suggest a superimposed traumatic injury.

Dr. Kelly Scrantz reviewed Harper's MRIs and medical records on behalf of Weyerhaeuser in March of 2020. Dr. Scrantz believed that while Harper had some leg improvement following surgery, he continued to have chronic back pain. Harper's MRIs from February 4, 2018 and April 23, 2019 showed no significant structural differences or changes. There did not appear to be any significant traumatic abnormalities caused by the accident.

Dr. Scrantz's diagnosis was chronic low back pain and lumbar radiculopathy with postlaminectomy syndrome. It was clear to Dr. Scrantz that Harper's chronic back pain was present before and after his surgeries and prior to his accident. The MRI comparisons showed no structural worsening or trauma from the injury. Considering Harper's chronic pain and Dr. Mosura's previous recommendation for a lumbar fusion, Dr. Scrantz believed that it was only a matter of time before Harper had a symptomatic worsening of his lower back and needed a lumbar fusion surgery.

Dr. Scrantz saw no objective evidence of worsening of Harper's lower back based on the medical records that he reviewed. Harper's subjective complaints of worsening from the accident are the only causal link to the accident. Dr. Scrantz had concerns about Harper's credibility because of his ongoing drug addiction as well as his discrepancies when telling Dr. Campbell about his cigarette use. Dr. Scrantz questioned causation that was based solely on Harper's complaints. Dr. Scrantz opined that there was simply no objective evidence available to him to prove or say that Harper was actually injured with a work accident.

9

*Trial*

This matter was tried on April 28, 2021. The WCJ heard live testimony from Harper and Scott Traweek, the dry end supervisor who brought Harper to the clinic on March 13. Most of Traweek's testimony concerned what was already in his written statement. Numerous documents, most of which were medical records, were accepted into evidence.

Harper testified that he first hurt his lower back while working on his car. He related that after he was released to work by Dr. Campbell in 2018, Weyerhaeuser required him to see their physician. Harper testified that his back pain was moderate when he returned to work and he was able to handle it. The pain was not enough to keep him from working.

When Harper was questioned about the high pain scores that he reported before the accident, he explained that he thought that the pain he experienced before the accident was as bad as it could get, but he realized he was wrong. His concept of pain on a scale of 1-10 dramatically changed when he experienced greater pain after the accident.

Harper was examined extensively by Weyerhaeuser's counsel regarding his tobacco smoking habits and his drug and alcohol addictions. In particular, he was examined about an incident in July of 2020 when he called Dr. Campbell's office after a pharmacist would not fill his Norco prescription. Later that day, Harper called law enforcement to report that his home had been burglarized and among the items missing were some prescription drugs. A deputy found some of the drugs that had been reported missing in Harper's house.

Dr. Campbell testified by deposition. He explained that he has not seen Harper since September 17, 2020. Dr. Campbell acknowledged that it

is sometimes hard to tell from a MRI if there's an acute disc herniation or a disc bulge. He was uncertain when he looked at the December 2017 MRI whether it was disk herniation or a disk bulge that was causing the severe compression in the nerve at L5-S1. However, it turned out that Harper had an acute disk herniation or at least a herniated chunk of disk on the right-hand side of L5-S1.

Dr. Campbell thought that Harper showed good relief from his leg pain when he saw Harper on March 30, 2018. He also thought at that time that it was possible that Harper had transitioned to a chronic pain syndrome. Dr. Campbell explained that chronic pain syndrome is an elevated reporting of pain levels that do not necessarily match the underlying pathology seen on imaging. During that visit, Harper marked his pain as being around a 9/10 or a 10/10 for his current pain, pain on most days, and the worst his pain was. When Dr. Campbell was asked if Harper should have been allowed to return to work after reporting that level of pain, he replied that structurally everything was fine. He will release a patient to work if they can deal with the level of pain, structurally everything appears okay, and they are unlikely to tear something while working. He figured that Harper may have a flare up of pain but was not going to do anything that could lead to a paralyzing injury. Dr. Campbell stated that Harper would have been a candidate for chronic disability with his pain scores, but Harper wanted to return to work at the sawmill and the choice was up to Harper. Harper was motivated to return to work.

Dr. Campbell testified that he could not find any objective evidence of a structural change between 2018 and 2019. The MRI from April of 2019 did not show a new finding that clearly identified the cause of the new pain;

11

only the outcomes as reported by Harper had changed. Dr. Campbell surmised that Harper had the accident and he injured the disks a little worse, and he already had the psychological component of a chronic pain phenotype.

While Dr. Campbell agreed there was no objective evidence of a post-accident change on the imaging studies, he added that Harper had objective evidence of an abnormality in the spine, that being degenerative disk disease at L4-5 and L5-C1, which is known to cause back pain. When Dr. Campbell was asked if he knew whether the accident caused Harper's pain, Dr. Campbell answered that he knew Harper had bad disks and was in a good bit of pain before the accident, but the accident pushed him over the edge of not being able to work anymore. He remarked that Harper had a tenuous spine to begin with, but the accident got him to the point where he could no longer work.

Dr. Campbell acknowledged that he did not rely only on MRI findings as Harper's history and the physical exams indicated a change in symptomology following the accident. There was an objective finding on physical exam of weakness in one myotomal distribution.

Dr. Campbell agreed that degenerative disks become progressively worse no matter what, and it was more likely than not that Harper would have been unable to work eventually based on the mere passage of time. However, he could not say what that timetable would be as someone worsening from progression of degenerative disk disease generally does not "fall off a cliff." It is more of a stepwise regression instead of suddenly getting pain and being unable to work. He added that an accident or injury could cause someone functioning with pain to no longer be functional. He

12

explained they could be at a tipping point and then something pushes them over the edge.

Dr. Campbell stated that all knew was that Harper said he was picking up heavy objects at work and he felt a bad pop in his back, which could be a ligament injury, a disk injury, or a number of things which worsened his back pain.

Dr. Campbell acknowledged that Harper's pain did not go away during the year that he worked following his surgery. He had chronic pain and remained in pain management. It was just that his pain had gotten to the point where it was unmanageable. He went from being able to work to being unable to lift 20 pounds.

In summary, Dr. Campbell was clear that it was more likely than not that the accident aggravated Harper's back condition to the extent that he could no longer work. He stated that he saw Harper many times, knows what he did after the surgery, and that he returned to work. Harper was not great to begin with and had a lot of chronic pain, but in Dr. Campbell's mind, the injury pushed him over the edge.

Harper had been motivated to return to work in 2018 when he would have been a candidate for disability with his pain scores. According to Dr. Campbell, the fact that Harper returned to work for almost a year told him that Harper was good enough to return to work at some level at that time. However, he did not think Harper could return to work at the sawmill now based on how much pain he was experiencing.

Dr. Campbell testified that once a patient says he will not return to work, as Harper said on April 23, 2019, he does not have a high success rate of getting them back to work with or without surgery. He explained that

13

with the chronic pain phenotype, once someone has it in their mind that they can no longer work, it is very hard to get them to change their mind even with surgery.

Dr. Campbell acknowledged that he would revise his opinion if Weyerhaeuser had evidence that the accident was not how Harper made it out to be, or if something else happened that could have caused his condition.

### *Judgment*

Judgment in favor of Harper was rendered on December 21, 2021. Harper was found entitled to temporary total disability benefits and medical benefits. Weyerhaeuser was awarded a credit of $11,860.48 for the disability insurance benefits paid to Harper. Attorney fees of $10,500 were awarded. Weyerhaeuser was assessed two penalties. The first was $2,000 for the failure to pay indemnity benefits. The second was $2,000 for the failure to pay medical benefits.

The WCJ provided extensive oral reasons for judgment on October 15, 2021. The WCJ recognized that Weyerhaeuser contended that Harper was unable to prove by a preponderance of the evidence that he had a job accident or that he had an injury of any sort because of a job accident, with Harper's credibility and prior lower back condition the key components of this.

The WCJ concluded that Harper established by a preponderance of the evidence that he sustained a job accident causing injury to his low back. Regarding the existence of a workplace accident, the WCJ noted that: (i) Harper's testimony regarding a workplace accident was corroborated by the circumstances following the unwitnessed accident; (ii) Harper's coworkers

14

confirmed that something happened that day; (iii) Harper promptly reported the accident to his employer; (iv) Harper's description of the incident that he gave to physicians has been consistent; (v) Harper never denied the prior back problem or that he was having problems prior to the accident; and (vi) issues surrounding tobacco and drug use by Harper were not germane to whether Harper had an accident.

Concerning Harper's call to law enforcement about stolen drugs, the WCJ stated that Dr. Mosura did not note any problems with Harper abusing prescribed narcotics. While Dr. Campbell acknowledged it was suspicious, it did not cause him to think that Harper was involved in drug-seeking activity. Therefore, the police report was nothing more than a mere suspicion and it did not convince the WCJ that Harper's testimony about what happened on March 6 was not believable.

Regarding whether Harper sustained a disabling injury, the WCJ recognized that the fact a condition is pre-existing does not preclude recovery. The WCJ also did not believe that the issue was whether the disease on its own may have disabled the employee through the ordinary progression of time. The WCJ noted that Dr. Partington and Dr. Scrantz are neuroradiologists who never examined Harper. In contrast, his treating physician, Dr. Campbell, released him back to work and he worked for nearly a year without any restrictions.

The WCJ disagreed with Weyerhaeuser that Harper cannot prove he sustained an injury without an objective finding on an MRI, as objective medical evidence is not necessarily limited to objective radiographic imaging. The WCJ noted Dr. Campbell's testimony that Harper was experiencing greater pain than he had had since his surgery. Dr. Campbell

15

also pointed to the degenerative discs as the source of the pain. The WCJ recognized that greater weight can be given to the opinion of a treating physician. Moreover, Dr. Mosura's records show that he saw a small angular tear at L5-S1 when he reviewed the MRI done on April 23, 2019. That was a positive finding of a condition not noted on his prior MRI.

The WCJ concluded that Harper carried the burden of proving he is entitled to a presumption of causation. Although the argument was made that he is not entitled to the presumption because he was being treated for that low back condition just six weeks before the accident, the evidence was clear that he was released to return to work about eight weeks after his 2018 surgery. Weyerhaeuser did not contradict Harper's testimony that he went to Weyerhaeuser's doctor before he was cleared to return to work. In the WCJ's view, the records indicated it was an aggravation of a pre-existing condition, and Harper was entitled to the presumption because even though he had the prior lower back problem, he was not required to be in perfect health, but only in good health, which was shown by his ability to perform his job. The WCJ added that once the presumption applied, Weyerhaeuser was required to do more than just produce a contrary opinion. They had to prove something else was occurring to account for his pain.

Although the WCJ found that Harper had problems with general veracity, he believed that Harper was credible. Nevertheless, the WCJ concluded that credibility was not a factor.

Regarding Sedgwick's denial of his claim, the WCJ noted that the specific reason for the denial was unknown since no representative from Sedgwick testified at trial. Moreover, through extensive investigation, Weyerhaeuser obtained information that it relied on to show that Harper was

16

unworthy of belief. However, none of that information was known or available to Sedgwick or Weyerhaeuser at the time the claim was denied.

The WCJ remarked that Weyerhaeuser went out of its way to deny benefits. Weyerhaeuser and Sedgwick knew his account of the accident was corroborated by his coworkers and by his reports to the physicians on March 7 and March 13. All they had other than that were his statements that he hurt so bad that he no longer wanted to work, and some medical records showing his prior surgery. The WCJ considered Sedgwick to be a sophisticated adjuster which ignored the existence of a specific identifiable event and that Harper did not have to show an objective radiological sign of injury. Once the claim progressed, Sedgwick searched far and wide to find ways to attack Harper's credibility on matters not germane to the issues at hand. The WCJ found that Weyerhaeuser engaged in a frivolous legal dispute as it possessed no factual or medical information to rebut the evidence of a job accident and an injury.

## DISCUSSION

Factual findings in workers' compensation cases are subject to the manifest error or clearly wrong standard of appellate review. *Banks v. Industrial Roofing & Sheet Metal Works, Inc.*, 96-2840 (La. 7/1/97), 696 So. 2d 551. Where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the reviewing court should make its own independent *de novo* review and assessment of the record. *Ferrell v. Fireman's Fund Ins. Co.*, 94-1252 (La. 2/20/95), 650 So. 2d 742; *Campo v. Correa*, 01-2707 (La. 6/21/02), 828 So. 2d 502.

17

Weyerhaeuser contends the WCJ erred as a matter of law in concluding that Harper was not required to prove an objective injury and in holding that Harper was entitled to the presumption of causation. Therefore, according to Weyerhaeuser, this court should conduct a *de novo* review and reverse the finding of Harper's entitlement to workers' compensation benefits because he failed to prove that he was in an accident and that he was disabled because of the alleged accident. In the alternative, Weyerhaeuser argues that the trial court erred in awarding attorney fees and assessing penalties.

*Accident*

An employee is entitled to workers' compensation benefits if he "receives personal injury by accident arising out of and in the course of" his employment. La. R.S. 23:1031(A). An accident is defined as "an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration." La. R.S. 23:1021(1). The initial burden of proof is upon the claimant to establish, by a preponderance of the evidence, that an accident occurred on the job and that the claimant sustained an injury. *Matthews v. Big Easy Janitorial, L.L.C.*, 22-0164 (La. App. 4 Cir. 8/10/22), 346 So. 3d 325.

A claimant's testimony alone may be sufficient to establish an accident provided that (1) no other evidence discredits or casts serious doubt upon the worker's version of the incident, and (2) the worker's testimony is corroborated by the circumstances following the alleged incident. *Bruno v. Harbert Int'l Inc.*, 593 So. 2d 357 (La. 1992). In determining whether the

18

*Bruno* factors are satisfied, the courts commonly consider if there was a late report, the testimony of a supervisor or coworker, the testimony of family and friends, medical evidence, whether the claimant continued to work, and prior injuries. *Brown v. Offshore Energy Serv., Inc.*, 47,392 (La. App. 2 Cir. 8/8/12), 104 So. 3d 494.

Weyerhaeuser argues that the trial court erred in not requiring Harper to prove an objective injury. Weyerhaeuser also maintains that Harper never met his initial burden of proving that he was injured in an accident. A reading of the WCJ's reasons for judgment fails to show that the WCJ concluded that Harper did not have to show objective findings of injury.

The WCJ stated that Weyerhaeuser's argument that Harper cannot prove he sustained an injury without an objective finding on an MRI was incorrect. The WCJ then cited *Bridges v. Gaten's Adventures Unlimited, L.L.C.*, 14-1132 (La. App. 1 Cir. 4/2/15), 167 So. 3d 992, and added that *Bridges* explained that objective findings of an injury are not necessary for an individual to be able to prove that he sustained a job accident. However, the WCJ later went back to the issue of lack of an objective finding on a MRI when he stated:

> He has the burden of proving by clear and convincing evidence that he's entitled to temporary total disability benefits, but he must do that by objective medical evidence. Not only is objective medical evidence limited to radiographic imaging, objective medical evidence is not necessary limited to objective radiographic imaging.

The WCJ also stated, "He didn't have to show objective sign radiologically of an injury." Thus, the point that the WCJ was trying to get across was that Harper did not have to rely on MRIs, CT scans, or x-rays to meet his burden of proof. He could rely on other objective medical evidence. Therefore, the

19

WCJ did not commit legal error in determining what Harper had to prove in order to establish an accident.

Weyerhaeuser points to medical evidence as showing that Harper's injury was present before his alleged accident, with Harper first experiencing severe back pain on or about May 6, 2017, when a car fell on him while he was working on it. Weyerhaeuser particularly notes that Harper reported 10/10 back pain to Dr. Mosura on January 22, 2019.

Weyerhaeuser also points out that Harper presented no evidence of an objective injury. Dr. Partington reviewed lumbar MRIs taken on December 2, 2017, February 4, 2018, and April 23, 2019. Dr. Partington found no objective evidence of an injury: "There has been no detrimental change in the appearance of the spine to suggest a superimposed traumatic injury."

Weyerhaeuser notes that Dr. Campbell testified that he agreed with Dr. Partington that the April 23, 2019 MRI showed no objective evidence of an injury. Dr. Scrantz, a neurosurgeon, looked at the pre-accident and post-accident MRIs and concluded that the "MRI comparisons both before and after the accident prove no structural worsening or trauma from the injury in question."

Weyerhaeuser maintains there was no other objective evidence of an injury. After reviewing Harper's medical records, Dr. Scrantz concluded that that was no objective evidence available to him to prove or say that Harper was actually injured with a work incident. Weyerhaeuser also points out that Dr. Campbell agreed that there was no objective evidence that Harper's condition changed structurally between 2018 and 2019.

Weyerhaeuser contends that the Harper's subjective complaints of increased pain are insufficient to satisfy his burden of proving an injury. It

20

notes that Harper reported the same pain both before and after the accident, and that he frequently reported less than 10/10 pain after March 9. Most significantly, Weyerhaeuser maintains that no weight should have been given to Harper because he was consistently shown not to be credible. Notably, he (i) was untruthful with Weyerhaeuser's counsel at his deposition about ever being addicted to a controlled substance or alcohol; (ii) admitted to lying to doctors at the Veterans Administration Medical Center ("VA") to expedite treatment for addiction; (iii) told doctors at the VA that he had nightmares about being in combat despite never experiencing combat; (iv) made a police report that his prescription drugs were stolen on the same day that he was turned down for a refill of a prescription for Norco, and the drugs that he reported stolen were found in his house; (v) was not truthful with his doctors about his smoking habits, and (vi) disputed statements in his own medical records.

Finally, Weyerhaeuser argues that Harper was motivated to claim an injury because he was in significant pain before the accident and needed additional pain medication.

Although his two coworkers were not directly observing Harper at the precise moment when the accident occurred, they saw or heard what occurred immediately afterward. Moreover, it is not outside the realm of possibility for an individual to sustain a back injury while lifting heavy objects with both hands, then twisting around and bending to place them on the floor. Harper timely reported the accident to his supervisor. He was also consistent when telling his health care providers what had happened.

It is clear from Harper's medical records and Dr. Campbell's testimony that Harper had a serious lower back condition well before the

21

accident occurred. Harper was already being treated with opioids for chronic pain when Dr. Campbell initially saw him. Dr. Campbell testified that Harper had degenerative disk disease at L4-5 and L5-S1 when he first saw him, and Harper remains plagued by that today.

There was evidence that Harper was in a worse condition following the accident than he was beforehand. Most notably, Harper experienced leg pain again after the accident. Dr. Campbell did not think Harper had any leg symptomology when he saw him on March 30, 2018. When Dr. Campbell treated Harper after the accident on April 16, 2019, it was noted that leg pain which had largely improved after surgery had returned. Dr. Campbell also found weakness in one myotomal distribution during a physical examination. Dr. Mosura noted on May 29, 2018, that Harper's leg pain had resolved. Harper complained to Dr. Mosura about leg pain following the accident. Although it was overlooked by most of the physicians who viewed the April 2019 MRI, Dr. Mosura noted on February 11, 2020, that there was a small annular tear at L5-S1. Dr. Campbell's records from October 31, 2019, reflect that imaging showed L5-S1 had a disk bulge with an annular tear especially on the right side.

While Harper rated his pain as a 10/10 when he was treated by Dr. Mosura less than two months before the accident, he also told Dr. Mosura during that visit that while his low back pain was a bit worse with the cold weather, he was overall doing well with the extra Percocet.

Despite his self-reported pain levels, Harper was released to return to work in 2018 and continued to work a physical-labor job until the accident. Based on this record, we cannot conclude that the WCJ was clearly wrong in

22

finding that Harper established that an accident occurred on the job and that he sustained an injury.

### *Causation*

Weyerhaeuser contends that the WCJ erred in concluding that Harper was entitled to the presumption of causation. Weyerhaeuser further contends that, in any event, Harper did not meet his burden of proving he was disabled because of an alleged accident.

The claimant is not required to prove the exact cause of the disability, but he must show by a preponderance of the evidence that the accident had a causal connection with the disability. *Iberia Medical Ctr. v. Ward*, 09-2705 (La. 11/30/10), 53 So. 3d 421; *Whitten v. Patterson UTI Drilling Company, LLC*, 53,431 (La. App. 2 Cir. 4/22/20), 294 So. 3d 590. Where the claimant suffers from a preexisting condition, he may still prevail if he proves that the accident aggravated, accelerated, or combined with the disease or infirmity to produce disability for which compensation is claimed. *Peveto v. WHC Contractors*, 93-1402 (La. 1/14/94), 630 So. 2d 689; *Whitten*, *supra*.

Disability may be presumed to have resulted from an accident if, before the accident, the claimant was in good health, but commencing with the accident, the symptoms of the disabling condition appear and continuously manifest themselves afterward, provided that there is sufficient medical evidence to show a reasonable possibility of a causal relation between the accident and disability, or the nature of the accident, combined with the other facts of the case, raises a natural inference of causation. *Doucet v. Baker Hughes Prod. Tools*, 93-3087 (La. 3/11/94), 635 So. 2d 166; *Whitten*, *supra*.

23

Weyerhaeuser contends that Harper was not entitled to a presumption of causation because the evidence clearly showed that Harper was not in good health before the accident. Notably, he reported back pain of 10/10 a mere six weeks before the accident. Dr. Mosura also noted at that time that Harper would likely require a fusion.

Weyerhaeuser next argues that even if Harper was in good health before the accident, he still was not entitled to the presumption of causation when there was insufficient medical evidence to show a reasonable possibility of a causal connection between the accident and the disabling condition, or that the nature of the accident, when combined with the other facts of the case, raises a natural inference through human experience of such a causal connection. Additionally, based on the other facts of the case, Harper's lack of credibility and his motivation for claiming an accident and disability, there is no natural inference of a causal connection.

Weyerhaeuser next argues that Harper never met his burden of causation. Weyerhaeuser refers to Dr. Scrantz's conclusion that it was a matter of time before Harper had symptomatic worsening, there was no objective evidence of worsening, and that Harper's complaints of an aggravation were not credible.

Weyerhaeuser is critical of Dr. Campbell's assertion that there was an aggravation. First, that finding was based solely on Harper's subjective complaints of increased pain. Second, it was inconsistent with the rest of Dr. Campbell's testimony that Harper would have been a candidate for chronic disability before the accident. In addition, Dr. Campbell noted on March 30, 2018, that it was unlikely that Harper would be able to return to work full duty given the multiple foci of pain that he had. Third, Dr.

24

Campbell only reviewed about ten pages of medical records from other providers and did not have a full picture of Harper's condition. Finally, Dr. Campbell's position was equivocal as he was open to revising his opinion on causation if presented with contrary evidence.

Weyerhaeuser cites *Guillory v. Wal-Mart Stores, Inc.*, 01-127 (La. App. 3 Cir. 10/3/01), 796 So. 2d 772, *writ denied*, 01-2988 (La. 1/25/02), 807 So. 2d 844, for the principle that the presumption of causation can apply to a claimant who has exhibited symptoms in the distant past, provided that he has suffered no such symptoms immediately prior to the work-related accident. While it is true that Harper exhibited symptoms in his lower back before his accident, he did not exhibit disabling symptoms until after the accident. He had surgery approximately 13 months before his accident and once he was released to work, he worked for nearly a year.

Harper testified that he would be working at the sawmill if he still were physically able. He insisted that he loved his job and wanted to work. He began using methamphetamines because he was depressed from being unable to work.

While Harper was not in "good health" in terms of overall health before the accident, he was in relatively better health compared to how he was after the accident.

Dr. Campbell regarded Harper as being motivated to return to work in 2018 when he would have been a candidate for disability with his pain scores. According to Dr. Campbell, the fact that Harper returned to work for almost a year told him that Harper was good enough to return to work at some level at that time. However, he did not think Harper could return to work at the sawmill now based on how much pain he experienced.

25

Dr. Campbell made it clear that he believed it was more likely than not that the accident aggravated Harper's back condition to the extent that he could no longer work. He described the injury as pushing Harper over the edge. We are mindful that the opinion of the treating physician should be accorded greater weight than that of a physician who sees the patient only once or twice. *Miller v. Rayville Manufacturing*, 53,573 (La. App. 2 Cir. 11/18/20), 307 So. 3d 1138. We are equally mindful that the treating physician's testimony is not irrebuttable, and the trier of fact is required to weigh the testimony of all medical witnesses.

Dr. Campbell testified that he would revise his opinion if presented with new contrary evidence. This is not equivocation. Rather, it shows that Dr. Campbell approached these questions regarding the accident and the disability with an open mind.

The WCJ did not err in applying the presumption of causation. Weyerhaeuser never overcame this presumption. Based on this record, we cannot conclude that the WCJ was clearly wrong in finding that the accident had a causal connection with Harper's worsened condition.

### *Penalties and attorney fees*

Weyerhaeuser argues that the WCJ erred in awarding attorney fees and assessing penalties. Harper counters that attorney fees and penalties were proper, but that the trial court erred in not assessing an additional $4,000 in penalties. The additional penalties are attributed to Weyerhaeuser's failure to authorize his choice of physician and its failure to pay medical and prescription bills. Harper also seeks an increase in attorney fees for work required by this appeal.

26

La. R.S. 23:1201(F) governs the assessment of penalties and award of attorney fees for an employer's failure to pay benefits or authorize medical treatment. La. R.S. 23:1201(F)(2) states that this Subsection shall not apply if the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control.

The crucial inquiry in determining whether to impose penalties and attorney fees is whether the payor had an articulable and objective reason to deny payment at the time it took action. *Lafayette Bone & Joint Clinic v. Louisiana United Business SIF*, 15-2137 (La. 6/29/16), 194 So. 3d 1112.

We review the award of attorney fees and penalties under the manifest error standard of review. *Davenport v. Foster Farms, L.L.C.*, 46,430 (La. App. 2 Cir. 7/13/11), 69 So. 3d 1263, *writ denied*, 11-1781 (La. 10/14/11), 74 So. 3d 213.

Weyerhaeuser maintains that following the accident, it initiated an investigation which showed that Harper had a very serious pre-existing back condition, he was actively treating for that condition before the accident, and there was no evidence of a change in his condition. It particularly notes that on January 22, 2019, Harper reported to Dr. Mosura that he was currently experiencing 10/10 back pain. Dr. Mosura believed that Harper would likely need additional surgery to alleviate his ongoing back pain. What presents a problem for Weyerhaeuser is that the medical records documenting the January 22 visit were not in the exhibit introduced at trial which contained the records received by Sedgwick. Those medical records were admitted into evidence as parts of other exhibits.

Among the documents received by Sedgwick, at least according to the exhibit, were: (i) the records from the Louisiana Family Medicine Clinic

27

following the accident; (ii) an x-ray of the lumbar spine taken on March 7 which showed probable minimal degenerative disc change at L5; (iii) a CT scan of the lumbar spine taken on March 13, 2019, which showed mild degenerative disc and arthritic changes; (iv) the record from Dr. Mosura on April 3, 2018, when Dr. Campbell referred him, and which showed a current pain level of 8/10 with 10/10 as the worst pain level, (v) the record from Dr. Mosura on September 25, 2018, which showed a current pain level of 8/10, notation of lumbar surgery eight months earlier, prescriptions for Percocet, and a diagnosis of chronic pain; (vi) the record from Dr. Mosura on October 23, 2018, which showed a current pain level of 8/10 and a worst pain level of 10/10, a notation of lumbar surgery, a prescription for Percocet, and a diagnosis of chronic pain; (vii) records from Dr. Campbell for visits from November 9, 2017 to March 30, 2018; (viii) an MRI report from December 2, 2017; (ix) records concerning the decompression and laminectomy on January 22, 2018, and the repair surgery the following month; (x) a CT scan of the lumbar spine from May 6, 2017, which showed mild canal stenosis at L4-5 and a posterior disc bulge at L5-S1 which abuts both S1 nerve roots in the central canal; (xi) a CT scan of the lumbar spine done on August 11, 2017, which showed left paracentral posterior herniation of disc material at L4-5, and posterior broad-based bulging of disc material at L5-S1; and (xii) the return to work note from Dr. Campbell in April of 2018.

Even without the record from Dr. Mosura concerning the visit on January 22, 2019, Sedgwick still possessed enough information about Harper's lower back history to reasonably controvert the claim. Accordingly, the WCJ was clearly wrong in finding to the contrary.

28

*Credit for disability benefits*

Under La. R.S. 23:1225(C), an employer is entitled to an offset if the employee receives remuneration from benefits under disability benefit plans in the proportion funded by an employer. Harper argues that the WCJ erred in awarding this credit for long-term benefits when the premiums were paid by Harper. Harper additionally argues that he did not receive a remuneration if he is required to pay back that amount to Hartford pursuant to their lien; thus, Weyerhaeuser would receive a credit for funds that Harper was not allowed to keep. Alternatively, Weyerhaeuser should pay for Hartford's lien so it does not receive a credit for funds that Harper did not keep. Weyerhaeuser counters that the issue of a credit for long-term benefits was not decided by the WCJ and is not before this court on appeal.

Harper testified that he received short-term disability benefits for six months, and then long-term disability benefits through November of 2020. He thought the short-term disability insurance was provided to him at no cost.

We agree with Harper's argument that the short-term benefits would not be a remuneration in the event that Weyerhaeuser receives a credit and Hartford enforces its lien against him. Accordingly, we amend the judgment to provide that in the event that Hartford enforces the lien for short-term disability benefits against him, then Weyerhaeuser is not entitled to a credit for that amount.

## DECREE

The judgment is reversed insofar as it awarded attorney fees and assessed penalties. The judgment is amended to provide that Weyerhaeuser is not entitled to an offset for short-term disability benefits received by

29

Harper to the extent that Hartford enforces its lien against Harper. In all other respects, the judgment is affirmed at Weyerhaeuser's costs.

JUDGMENT REVERSED AS TO PENALTIES AND ATTORNEY FEES; AMENDED AS TO CREDIT FOR DISABILITY BENEFITS IN THE EVENT OF LIEN ENFORCEMENT; IN ALL OTHER RESPECTS, AFFIRMED.